# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

JOSHUA MARTIN MIRACLE,
Defendant and Appellant.

S140894

Santa Barbara County Superior Court
1200303

December 3, 2018

Chief Justice Cantil-Sakauye filed the opinion of the court, in which Justices Chin, Corrigan, Cuéllar, Kruger and Ikola[*] concurred.

Justice Liu filed a dissenting opinion.

---

[*]     Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. MIRACLE

S140894


Opinion of the Court by Cantil-Sakauye, C. J.


Defendant Joshua Martin Miracle pleaded guilty to the first degree murder of Elias Raymond Silva (Pen. Code, §§ 187, subd. (a), 189; further undesignated statutory references are to the Penal Code), and to assault with a deadly weapon, a knife, on Jaime Alfaro Lopez (§ 245, subd. (a)(1)).  He admitted two special circumstances:  that he intentionally killed Silva by means of lying in wait (§ 190.2, subd. (a)(15)), and that he intentionally killed Silva while defendant was an active participant in a criminal street gang and the murder was carried out to further the activities of the gang (§ 190.2, subd. (a)(22)).  In connection with the murder of Silva, he admitted the allegations that he personally used a deadly or dangerous weapon, a knife, (§ 12202, subd. (b)(1)), and that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)).  In connection with the assault on Lopez, he admitted the allegations that he personally used a deadly or dangerous weapon, a knife, (§ 12202, subd. (b)(1)), and that he personally inflicted great bodily injury (§ 12202.7, subd. (a)).  At the penalty trial, the jury returned a verdict of death.  This appeal is automatic.  (Cal. Const., art. VI, § 11; § 1239, subd. (b).)  We affirm the judgment.

## I. STATEMENT OF FACTS

### A. Evidence of the Charged Crimes

#### 1. *Murder of Elias Silva*

Because defendant pleaded guilty to the charges and allegations, evidence related to the crimes was submitted at the penalty phase to establish the circumstances of the crimes. (§ 190.3, subd. (a).)

Elias Silva was killed on Saturday night or Sunday morning (October 2 or 3, 2004) in Robert Galindo's apartment. Galindo agreed to testify pursuant to an agreement that he plead guilty to voluntary manslaughter in connection with the death of Silva. As described below, defendant and Robert Ibarra spent several days in Galindo's apartment, coerced and threatened Galindo to lure Silva to the apartment, and then stabbed Silva 48 times.

Galindo and Ibarra had been friends for about three years, and in the days before Silva was killed, they consumed methamphetamine together in Galindo's apartment. Galindo was also friends with Danny Ramirez, who had arranged with Galindo to come to Galindo's apartment on Thursday night, September 30, to give Silva a tattoo. When Ramirez arrived at the apartment, defendant was with him. Galindo had not met defendant before that evening. Silva also came to the apartment, and he and Ramirez discussed the tattoo, but apparently agreed to do the tattoo the next day. Ramirez then asked if he and defendant could stay at Galindo's apartment overnight.

The morning of Friday, October 1, while Galindo was showering, Silva came by the apartment and picked up Ramirez, leaving Galindo, Ibarra, and defendant in the

apartment. Galindo asked defendant why he was still there, and defendant told him Ramirez would come back for him. Ibarra left the apartment Friday night, but Galindo let defendant stay, because Galindo assumed Ramirez would eventually come back to get defendant.

On either Friday or Saturday, Galindo went to see Silva, bothered by the fact that when Silva came to the apartment to discuss the tattoo, he did not say "hi" to Galindo like he usually did. When Galindo asked Silva to explain, Silva told him that defendant was no good and that Galindo should get him out of his apartment.

Saturday morning, Ibarra returned to the apartment. During the day, defendant and Ibarra spent a substantial amount of time in Galindo's bathroom, consuming methamphetamine. Ibarra left the apartment at some point, and when he returned at around 8:30 or 9:00 p.m., the mood in the apartment changed. Ibarra was "wired," "antsy," in "a very hyper mood." Galindo inquired regarding the purpose of a duffel bag Ibarra brought back with him, and Ibarra said it was for Ibarra's and defendant's clothes. Galindo heard defendant talking about needing to take care of a "rat," which Galindo understood to refer to someone who was cooperating with law enforcement.

At some point, either defendant or Ibarra asked Galindo to call Silva, who sold methamphetamine, to bring drugs to the apartment. Galindo did not have a telephone, so he used Ibarra's mobile phone. Galindo called Silva, and Silva told Galindo that he did not want to have anything to do with "them," and that Galindo should "get them out of your house." Thereafter, Ibarra told Galindo to call Silva again. Because

Ibarra's telephone had to be charged, Ibarra suggested that Galindo go to a payphone to make the call.

Galindo left, but did not call Silva. When he returned to his apartment, defendant and Ibarra were in the bathroom, apparently consuming more methamphetamine. Defendant and Ibarra asked Galindo to call Silva again. Galindo then called wrong numbers a few times on Ibarra's telephone, and acted like he was calling Silva. Defendant and Ibarra told him to keep trying, and at some point, Galindo said he would go out to get some cigarettes and would try calling from the payphone again. When Galindo returned, Ibarra continued to urge him to call, and Galindo told him that he had left voicemail messages.

At this point, defendant was in the kitchen, taping the loose handle on a butcher knife from Galindo's kitchen. Defendant and Ibarra continued to tell Galindo to call Silva, and Galindo responded that he had already called Silva too many times. Ibarra was becoming more persistent about calling Silva, and both defendant and Ibarra were becoming agitated with Galindo. Galindo asked, "Why are you doing this to me?" Ibarra told him to "just shut the fuck up and call him." Galindo then said he would go to the payphone and call Silva one more time, but he did not call Silva.

When Galindo returned, his furniture had been moved from the living room to the kitchen area, leaving more open space in the living room. Galindo asked why his belongings had been moved, and Ibarra told him to shut up and call Silva. Defendant then brought out the butcher knife, stood behind Galindo, put his arm around Galindo, and held the knife by Galindo's throat or upper chest. Defendant told Galindo, "You

4

need to call." In addition, defendant wanted to listen to Galindo's call because he and Ibarra did not believe that Galindo was calling Silva. Yelling back and forth ensued, and Galindo was crying. Defendant told Galindo, "I don't care what you say to him to get him over here, you just need to get him over here."

Galindo called Silva and left a message that Galindo's cousins were in town, they wanted to party, and Silva should bring some drugs. Within a few minutes, Silva called back, and Galindo spoke to Silva while defendant continued to hold a knife to him. After confirming that his cousins were still there, Galindo told Silva to meet him in the back. Galindo had never before told Silva to meet him in the back, and he thought Silva might guess that something was amiss. When Silva called again and said he was two minutes away, defendant told Galindo not to go out, and instead to meet Silva at the apartment door. Silva called again, asked why Galindo did not come out, and said he was coming to the door.

Ibarra then stood in a position to be the first person Silva would see when the door opened. Defendant stood behind Galindo to make sure Galindo opened the door. As Silva started to enter, Ibarra pulled him inside. Defendant pushed Galindo to the side, rushed at Silva, and helped Ibarra drag him into the center of the room. When defendant pushed Galindo to the side, defendant still had the knife in his hand. Defendant closed the door and told Galindo to lock it, but Galindo left the apartment to look for Silva's "homeboys."

Galindo did not find them. He then went to look for his roommate Phillip, because Ibarra had said that he was going to kill anyone who came through the apartment door. About 20

5

or 25 minutes after leaving the apartment, Galindo headed back to the apartment, and saw a trail of blood drops and bloody footprints in the direction of the parking lot where Silva would have parked his car. Galindo returned to his apartment, and discovered broken furniture and Silva lying in blood. Galindo fled again, looking for Phillip.

Deputy Sheriff Lawrence Hess and a second deputy arrived at the apartment in response to a later 911 call. They saw a trail of blood leaving the apartment, and when they entered the apartment, they saw that furniture had been moved and tipped over, there was a "large amount of blood in the living room area," and Silva's body was on the carpet.

Defendant and Ibarra were arrested in San Diego, driving Silva's car. Ibarra had a puncture or stab-type wound to his leg, and there appeared to be a fresh blood stain on the floor of the car. Photographs taken after defendant was arrested showed "ESG" tattooed on the back of defendant's head, and a number of small tattoos on his chest.

The parties stipulated that Silva was stabbed 48 times. Photographs of many of the stab wounds were admitted, including a photograph of Silva's heart with a stab wound in it.

Lisa Hemman, a senior identification technician in the forensics unit of the Santa Barbara County Sheriff's Department, identified various objects found in a duffel bag in the apartment, including a hammer or hatchet-looking item, two tarps, plastic sheeting, duct tape, pliers, and a workman's knife. Galindo identified Ibarra in a videotape, purchasing items at a Home Depot. A receipt from the Home Depot reflected the purchase of a poly sheet, vinyl gloves, and a tarp. Hemman also identified in photographs wounds on the side

and front of Silva's neck, and numerous other injuries, most consisting of puncture or stabbing wounds.

Finally, Detective Gary Siegel testified as a gang expert. In his opinion, the murder of Silva was for the benefit of the Eastside Gang.

### 2. *Assault with a Deadly Weapon on Jaime Lopez*

Jaime Lopez testified that he was a member of the Eastside Gang, and that the "ESG" tattoo on the back of defendant's head stood for "Eastside Gang." He admitted driving to a Circle K store on September 23, 2004, but stated that he did not see defendant there, and did not remember telling a grand jury that he saw defendant in the parking lot. Lopez further testified that he did not know how he got a stab wound on his back or a cut over his eye, and that he did not say anything to the contrary to the investigating detective, Gary Siegel.

Detective Siegel testified that Lopez and defendant were members of the Eastside Gang, and that Lopez told him that defendant stabbed him on September 23, 2004, at a Circle K store. He also testified that Lopez was very worried about the ramifications of testifying. Finally, Siegel testified that, in his opinion, the assault on Lopez was for the benefit of the Eastside Gang.

### B. Other Evidence

The People presented testimony concerning a violent incident in the holding cell at the courthouse and two violent incidents in the county jail. They also presented a stipulated list of more than two dozen incidents of violence or threats by defendant from 1993 to 2005. This evidence is described below,

in connection with the discussion of defendant's contention that he was subjected to excessive restraints in the courtroom.

In addition, James Nalls, an investigator with the district attorney's office, testified that he heard defendant make the following statements while in the courtroom on October 25, 2005. "I believe in accepting the consequences of my actions, good or bad, and maintaining my princip[les] regardless of the cost, including death. I feel that if I'm willing to kill I should also be willing to die." He also heard defendant state, "I didn't show any mercy, so I'm not going to ask for any mercy." Similarly, on August 9, 2005, Nalls heard defendant state during a telephone conversation, "The way I see it, if I'm willing to kill I should be willing to die, too."

Silva's widow, Deanna Garcia testified that she and Silva were together for 12 years, and had three children, ages nine, five, and three. Their children missed their father and asked about him every day. She tries to be strong for their children. Silva's mother, Suzanne Silva, testified that she was close to her son. He had left behind his life with the Goleta 13 gang in Santa Barbara. He had a good job at the University of California, Santa Barbara, and spent time with his children, taking them fishing and camping. The events had been very hard for her grandchildren. She missed her son very much.

Defendant's advisory counsel engaged in some cross-examination, but defendant did not present any evidence at the penalty phase and declined to make a closing argument. At a pretrial hearing on October 25, 2005, defendant personally described at length his reasons for not presenting mitigating evidence, including the point that the jury may decide that he does not deserve the death penalty because he

was not making excuses for his actions and was willing to accept responsibility. His advisory counsel then asked him to make clear for the record that he was not seeking the death penalty and would be pleased if the jury sentenced him to life without the possibility of parole. Defendant responded, "It would be correct to assume that I'm not seeking the death penalty." On November 21, 2005, the trial court held an in camera hearing with defendant and his advisory counsel to review all of the mitigating evidence obtained by the defense, and to confirm that defendant did not want the evidence presented.

## II. Pretrial Proceedings

As described more fully below, defendant sought to plead guilty to the capital murder charge and to admit a special circumstance allegation from the outset of the proceedings in March 2005. When his appointed counsel was unwilling to consent to a guilty plea, defendant asserted his right to represent himself. (See *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).) The trial court granted defendant's motion, and appointed advisory counsel to assist him. Advisory counsel reviewed all of the evidence with defendant, and eventually concluded that entering an unqualified guilty plea to the murder charge and admitting the special circumstance allegations was an intelligent tactic to try to avoid a death sentence. The trial court confirmed that advisory counsel had effectively acted throughout his appointment as counsel to defendant. The court allowed defendant to plead guilty to the capital charge and to admit the two special circumstance allegations.

## A. Procedural History

Defendant's first appearance in court following the grand jury indictment was in early March 2005, when he agreed to continue his arraignment to later that month.  At the later hearing, defendant's counsel, Michael Carty, informed the court that defendant intended to make a motion to represent himself, and that defendant was aware that the court might want to research the implications of his proceeding in propria persona in a capital case.  The trial court cautioned defendant regarding the serious and complex nature of the case, directed Carty to discuss all of the implications with defendant, and continued the matter.  Carty disclosed that he had discussed the issue with defendant for three hours, and was of the opinion that defendant was capable of making that decision under *Faretta*.  (*Faretta*, *supra*, 422 U.S. at p. 835.)  The trial court asked defendant to confer further with Carty, and to consider what the court had said.

In early April, Carty informed the court that defendant had indicated to him on multiple occasions that he intended to plead guilty at the earliest possible time to counts 1 (murder) and 2 (attempted murder), and to admit at least one of the special circumstance allegations.  Carty further disclosed that he had discussed with defendant section 1018, which prohibits a plea of guilty to a capital offense unless the defendant appears with counsel who consents to the plea.  Although defendant wanted his counsel to consent to the plea that day, Carty declined to do so, principally because he was still reviewing the grand jury transcript and investigating witnesses.  Therefore, Carty did not believe he could ethically support a change in defendant's plea that day.  He further explained that because he would not support defendant's

desire to plead guilty that day, it was defendant's wish to proceed with his motion to represent himself. Carty reiterated that he found no evidence of a mental incapacity that would preclude defendant's self-representation.

Carty then advised the court that if it granted defendant's motion to represent himself, the court would be called upon to provide defendant with advisory counsel. He further informed the court that it was required "to set the scope and the functions of advisory counsel. . . . And I think that the Court ought to authorize advisory counsel to be involved in the change of plea so that you could satisfy Penal Code Section 1018." In response to questioning by the court, Carty confirmed that the court could set the terms of the appointment of advisory counsel to require advisory counsel's consent in order to enter a guilty plea.

The court then obtained defendant's confirmation that he wanted to enter a guilty plea. Defendant further confirmed that he was comfortable with Carty's representation of him, but because Carty was not willing to consent at that point in time to a guilty plea and an admission of the special circumstance allegations, defendant wanted to represent himself. Carty stated that his primary objection to defendant's desire to plead guilty and admit the special circumstance allegations was that this course would make him eligible for the death penalty. The court explained to defendant that counsel was still reviewing the grand jury transcript and other materials, and was not yet in a position to consent to or oppose a guilty plea. The court further stated that if it granted a *Faretta* motion and appointed advisory counsel, "I can condition the appointment of advisory counsel on compliance with Penal Code Section 1018 which requires consent of that

advisory counsel." The court declined to take defendant's guilty plea or admissions to the special allegations, stating that the case was "far too serious," and that defendant's counsel needed more time to review the record.

Defendant responded that he wanted "to pursue the *Faretta* motions with the conditions Carty stipulated before." Carty then stated that defendant "has very strong opinions about what type of evidence should be presented on his behalf at the penalty phase," which would "pose a real problem to counsel. Because case law says that a defendant cannot prohibit counsel from presenting mitigation evidence over the objection of the defendant, that decision is placed entirely with trial counsel." He further explained that "[a] facet of this *Faretta* decision is allowing Mr. Miracle to present or to limit evidence at the penalty phase that he's never going to get me, or probably any other ethical lawyer, to go along with unless there's some sort of agreement reached, and I think that Mr. Miracle is concerned that he wants to control what sort of mitigation evidence is presented with Judge or jury. That argues, I believe, for the *Faretta* position, the pro per position, and I've discussed that with Mr. Miracle at length." The court reiterated that it would not rule on defendant's motion to represent himself until Carty finished reviewing the entire record.

In mid-April, at the continued arraignment hearing, Carty stated that he had reviewed all relevant materials, had discussed his review with defendant, and would not consent to a guilty plea or admission of the special allegations. He explained that "the question is not limited to whether or not he should admit guilt or enter guilty pleas to the charged count and admit the special allegations, a big part of the picture has

to do with Mr. Miracle's very strong preferences as to what material, if any, should be permitted at the penalty phase on the case, and whether or not he should cooperate with investigation and any expert witnesses that might be used in mitigation." He stated that he did not want to "reveal confidential communications, but Mr. Miracle and I cannot agree on the presentation of penalty phase material." Carty added that he did not think defendant would be able to find an attorney who would agree not to present evidence in mitigation. The trial court then explained to defendant that he had a right to have counsel represent him at the guilt phase, and could then decide to represent himself at the penalty phase. Defendant confirmed that he understood that possibility, and Carty confirmed that he had explained that approach to defendant. In addition, Carty had provided defendant with a copy of section 1018 and had spent hours discussing its impact on defendant's options. Carty also stated that defendant wanted to make an unequivocal request to proceed in propria persona at both phases of the trial.

The court then turned to defendant, who confirmed that he wanted to represent himself, that he had reviewed the indictment with his attorney, and that he understood the nature of the charges and potential penalty. In response to further questioning, defendant stated that he had been through the court system in other cases, but he had never represented himself and had no legal training. With respect to his understanding of how the court system works, he felt he could become familiar with each stage as the case proceeded and educate himself. He stopped regularly attending school at about age 11, when he was first sent to juvenile hall, and did not thereafter attend a full school year. He attended school at

the California Youth Authority beginning at age 14, taking both high school and college classes, and he could read and write.

Defendant stated that he wanted to represent himself because Carty was interfering with his desire to plead guilty, and Carty disagreed with defendant regarding the mitigating evidence to be presented. Defendant explained that he did not intend to cooperate with any professional investigators or psychologists, and did not intend to present any defense. The court asked defendant whether he understood that even if he represented himself, state law prohibited a plea of guilty, so he would not be able to avoid a trial. Defendant responded that he had been led to believe that if the court appointed an "assistant counsel," and that counsel was willing to consent to a guilty plea, that consent would be "just as legitimate as" Carty's consent. The court responded that it was highly unlikely that advisory counsel would be in a position to consent to a guilty plea and admission of special allegations, so there would be a trial regardless of whether he represented himself. The court asked if he understood that he would be better off having counsel, and defendant disagreed, noting that he did not intend to offer any defense.

Carty stated that defendant "has the mental capacity to waive the constitutional rights to counsel, he realizes the probable risk and consequences of his action, and his decision is voluntary and intelligent." Carty further stated that he could not formally oppose defendant's request to represent himself, but he had "spent hours and hours with Mr. Miracle suggesting to him that this *Faretta* motion is ill-advised." The court agreed that it was ill-advised, but granted the *Faretta* motion. It stated that it would "appoint stand-by counsel,

sometimes called advisory counsel, to assist you." It added that it was for the court to determine the parameters of counsel's role, and that the issue was one that "we can explore in terms of exactly what role advisory counsel will play." After the court twice referred to stand-by counsel, Carty stated that he had explained to defendant the difference between stand-by and advisory counsel, and that defendant was seeking advisory counsel. The court then inquired whether Carty might serve as advisory counsel, but he asked not to be appointed in light of defendant's opposition to his continued representation. Carty observed that another attorney, Joe Allen, had considerable experience with respect to homicide and death penalty issues, and the court appointed Allen as advisory counsel in late April.

Over the following weeks, as the court addressed the issue of the extent to which defendant would be allowed to review discovery materials that included witnesses' names and contact information, Allen took an active role in the proceedings. The court took note of Allen's active role, but informed defendant that it would be directing its comments to defendant, and that defendant should respond to the court. Thereafter, however, defendant continued to look to Allen to represent him. When confusion regarding the court's order concerning redaction and the defense investigator's access to the materials arose, defendant asked the court to allow Allen to explain the matter to the court, and the court agreed. Allen then handled most of the discussions concerning the circumstances under which defendant would be allowed to review the materials. When the court explained to defendant that the decision regarding expenditures for investigative tasks was up to defendant, defendant asked whether he could give Allen permission to spend the investigative funds as Allen

saw fit, as defendant did not "want to be bothered with that." Allen stated that defendant, the defense investigator, and Allen had been working together well in this regard, and the court responded that it wanted to make it clear to defendant that he was representing himself.

At the continued arraignment in mid-June, defendant stated that he wanted to plead guilty to all of the charges and to admit the special allegations. The court reiterated that it could not accept a guilty plea from him, and Allen stated that he had not found any case law related to whether the concurrence of advisory counsel to a guilty plea would satisfy section 1018. Defendant asked the court it if would be inclined to accept his plea with advisory counsel's consent, and the court stated it was not prepared to do so. It further explained that if defendant wanted to expedite the process, he could do so by asking for "a court trial within a relatively short period of time. And you can testify at your own trial. You can say to the Court whatever you desire. You're also entitled to have a jury trial, you can ask for that jury trial within sixty days of today. You can tell the jury whatever you wish to that might assist them in making a determination as to your guilt or innocence." It added that by choosing to represent himself, he had more limited options than he might have had with appointed counsel "at some point in time."

Defendant then asked if he could waive his right to continue to represent himself and have Allen appointed to represent him so that he could proceed with the arraignment. The court said it would not take that action that day. It stated that it had taken his decision to represent himself seriously, that they had discussed it and defendant had indicated why he wanted to represent himself. "You can't just . . . flip back and

forth between representing yourself and having someone represent you. You now have advisory counsel and he's there to advise you as you feel it necessary, but you're representing yourself. I'm giving you your options now as an attorney and as a defendant. As an attorney representing yourself and as a defendant."

The court clarified that it was not suggesting that it would not allow defendant to withdraw his in propria persona status in the future if he was sincere in wanting the assistance of counsel, but if his intent was "to play games with the Court, or to seek some other objective other than to have counsel appointed to assist you in preparing a competent defense, then, you know, we're in a different posture. I may not grant that request." The court then asked defendant why he wanted Allen to represent him when he had repeatedly indicated he wanted to represent himself. Allen interjected that the question elicited information related to defense strategy and defendant's approach, and should occur in chambers. The court asked Allen if defendant wanted him appointed as counsel so Allen could concur in his guilty plea. Allen confirmed that was defendant's purpose, and said he could not discuss in the presence of the prosecution defendant's reasons or why Allen's position was different from Carty's with respect to whether counsel should agree to a guilty plea.

The court then held an in camera hearing, at which Allen stated that he had discussed with defendant his reasons for wanting to plead guilty and to admit the special allegation of lying in wait. Allen stated that defendant was "correct in two fundamental points that are motivating his desire to enter this set of guilty pleas and admissions." First, defendant believed that the evidence against him was very strong, and that it was

highly likely that a judge or jury would find him guilty and find the special allegations to be true, but "[f]or reasons connected with his personal beliefs and outlook on life, he is not interested in plea bargaining with the District Attorney's office." Allen explained that defendant wanted the record to reflect that he had "not received any guarantees of any kind of consideration, leniency, or anything else in exchange for the plea. That the plea is what he wants to do to take responsibility for what he feels he did." Second, defendant believed that his acceptance of responsibility through his plea and admissions was his best strategy for avoiding a death sentence, and Allen agreed that this strategy, "even though it's highly risky, is the best strategy available on the facts of his particular case." Allen further explained, "obviously if that acceptance of responsibility is something less than completely free and unconditional it loses its moral strength as an argument . . . ."

With respect to his ethical situation, Allen stated that if a client's motive "makes no sense or is contrary to the client's best interests, then you have an ethical obligation not to cooperate," but here, given the strength of the evidence, Allen thought a jury would be irritated that it had to "hear several weeks of, essentially, uncontestable evidence." He stated that the evidence was "extremely strong," and "the likelihood of a conviction is extremely high." He also informed the court that he had tried about 65 murder cases, including 15 which potentially involved a death penalty, and had tried three capital penalty phases. He added, "I think I understand what I'm doing when I appraise the evidence in Mr. Miracle's case. [¶] Mr. Miracle doesn't have on the guilt phase a reasonable defense to any, except as I say, one minor allegation, which if it

were resolved in his favor wouldn't change the capital charge or any of the allegations connected to it." The trial court responded that the trial would not appear pointless if codefendant Ibarra pursued a jury trial.

Allen then explained defendant's intentions with respect to Ibarra: defendant felt that he dragged Ibarra into defendant's plan, and that defendant had led them to killing the victim; Ibarra had no intent to kill the victim, but defendant pulled Ibarra too far for him to back out. Defendant wanted to describe to the prosecutor and Ibarra's attorneys what defendant's testimony would be at Ibarra's trial, and wanted to testify at Ibarra's trial. Defendant felt that his obligation to take responsibility for his actions included accepting responsibility for what he led Ibarra to do, and that pleading guilty without any consideration would cause his testimony to have more weight with the factfinder in Ibarra's trial. Finally, Allen stated that he wanted defendant to testify in Ibarra's trial prior to the penalty phase in defendant's trial, and that he would "argue very strongly" in defendant's penalty phase that defendant's "willingness to tell the truth and help Mr. Ibarra" was also a point in favor of a sentence of life without the possibility of parole rather than a sentence of death.

The court then inquired whether the defense contemplated a jury trial at the penalty phase. Defendant said he did not, and explained that his only reason for pleading guilty was because he thought he was responsible, and he "want[ed] to do the right thing and take responsibility and offer exonerating testimony on behalf of Mr. Ibarra." He added that he "just want[ed] to make clear that . . . using that as mitigating evidence at the penalty trial is not my motive for

19

pleading guilty." The court sought to clarify that it was not defendant's *main* motive, and that the fact of his plea would be used at the penalty phase. Defendant responded, "[t]ell you the truth, I'm not concerned about it at all." Allen interjected that "[i]t would be fair to say that it is a very important factor for me in agreeing to go along with this proposal."

The court then attempted to clarify how the case would proceed. It stated that if it appointed Allen to represent defendant, and if Allen consented to defendant's guilty pleas and admissions of special allegations, the court would not let defendant represent himself at the penalty phase. Defendant stated that he wanted to waive his right to a jury trial at the penalty phase, and not to offer any mitigating evidence at that phase. He added that "I just don't believe in doing that, I believe the right thing for me to do is take responsibility." The court pointed out to defendant that Allen had indicated that he intended to present mitigating evidence, including the fact of defendant's admission. Defendant did not respond, but Allen explained that he had advised defendant that he was willing to help present an argument based on defendant's acceptance of responsibility, and that there might be other evidence that could be presented, but that defendant "has a very strong desire to limit that."

The court then explained to defendant that if it allowed defendant to withdraw his decision to represent himself, and thereby allow Allen to concur in his decision to plead guilty, the court would not allow him to represent himself at the penalty phase, and counsel would present mitigating evidence that might exceed what defendant wanted presented. It stated it would continue the matter for two weeks to allow defendant and Allen to think about whether Allen should be appointed to

represent defendant. Defendant asserted that the court was interfering with his right to take responsibility for his actions. The court responded that it was bound by state law regarding the entry of a guilty plea. Defendant then asked the court to research the possibility of accepting defendant's plea with the consent of advisory counsel. The court reiterated its view that defendant could plead guilty only with the consent of appointed counsel. The arraignment was continued for two weeks during which time Allen and defendant would review the rest of the evidence.

At the next hearing, in late June, the court asked defendant if he wanted to proceed with the arraignment, and defendant asked if he could have Allen address the court. Allen reiterated defendant's desire to plead guilty and to admit the special allegations, and argued, among other points, that there was a conflict between section 1018, which prohibits a defendant from pleading guilty to a capital offense without the consent of counsel, and the right under the Sixth Amendment to represent oneself. After articulating his legal arguments, Allen stated that if defendant could not establish the right to enter a guilty plea while representing himself, his second choice would be to have Allen represent him. The court stated that it was troubled by the reference to a second choice or preference, because the court had explained to defendant that he could not plead guilty if he represented himself, and had also explained that defendant could not go back and forth between representing himself and having legal representation. It indicated that it would probably grant a request to appoint Allen as his counsel, but would not then allow defendant to represent himself again if he did not like how Allen was representing him at either stage. The court then granted

Allen's request to brief the court regarding defendant's rights under *Faretta*.

In mid-July, Allen filed a brief in which he argued that defendant had a right to plead guilty and admit the special circumstance allegations with the consent of his advisory counsel, "at least where the record shows that advisory counsel is fully informed of the facts and the law, and has the experience and training to function as appointed defense counsel on a capital case. . . . The concurrence of advisory counsel under such circumstances fulfills all the policy objectives and protects against miscarriages of justice, to exactly the same extent as if defendant were 'represented' by counsel." Alternatively, he argued that the right of self-representation recognized in *Faretta* takes precedence over the restrictions of section 1018.

At the next hearing, a few days later, defendant confirmed that he still desired to plead guilty to the capital charge and all other charges except the charge of attempted murder. The court acknowledged defendant's brief concerning his asserted right to plead guilty, and addressed the role of advisory counsel, stating that a court may expand the roles and responsibilities of an advisory counsel at the request of the defendant. It also stated that it was clear over the preceding several weeks that defendant had desired Allen to play a more active role, and Allen interjected that he was "happy to perform that expanded role at Mr. Miracle's request." The court then explained that during trial, Allen's role would be limited in order to avoid conflicts concerning the presentation of the case, but these risks were not present during pretrial proceedings. Therefore, the court concluded, it could permit Allen to have a more active role prior to trial.

The court then turned to section 1018, noting that it prohibits a guilty plea in a capital case without the consent of counsel. It stated that it wanted "to be very clear in terms of the role that Mr. Allen is assuming in terms of duties and responsibilities at this stage of the proceedings because I want to make sure that we comply with the spirit of Penal Code Section 1018." It asked Allen whether he was willing, "at least up to this point in the proceedings, . . . to accept the duties and responsibilities of counsel for Mr. Miracle within the meaning of Penal Code section 1018?" Allen responded, "Absolutely," and added that he had discharged those duties during his service as advisory counsel. Allen stated that "[w]e have explored all the facts relating to the capital charge and I'm satisfied that Mr. Miracle's decision is a tactically intelligent one. It's not only voluntary and intelligent on his part in that he understands what his legal alternatives are, but it's an intelligent one in that I think it plays a proper role in an intelligent penalty phase strategy." He explained that he was referring to the matters discussed in the in camera hearing held in mid-June.

The court asked counsel if he would characterize his representation of defendant up to that point "as being one of counsel and not advisory counsel in terms of the duties and the functions that you've performed for him, and the assistance that you've provided to him." Allen responded that he had "spent the same time and diligence and explored the same information and issues to the same extent as if I had been appointed to represent him." The court confirmed with Allen that his statement was "with particular reference to the spirit of Penal Code Section 1018." The court also confirmed that Allen understood that his conduct to date would be examined,

for purposes of determining whether he provided effective assistance of counsel, in the same manner as if he were appointed counsel. Finally, defendant confirmed that he continued to desire to represent himself, stated that he accepted what the trial court described as Allen's "greatly expanded role," and added that he had encouraged Allen to take on the expanded role.

The court then stated that "the label that I'm going to continue to use with respect to you, Mr. Allen, will be advisory counsel. But I don't want there to be any ambiguity in the record, and I don't think there is, in terms of the greatly expanded role that you've assumed in discharging responsibilities as the functional equivalent as of counsel for Mr. Miracle." The court then continued the arraignment for two weeks to make certain that Allen and defendant had reviewed all of the discovery, and to give them additional time to think about the decision to enter pleas and admissions. Allen stated that he would review the plea form with defendant at the jail.

Defendant entered his plea at a hearing in late July. Defendant was present, as was Allen, his advisory counsel. The court reiterated that at a prior hearing in mid-July, the court wanted to ensure that defendant and Allen had reviewed all of the District Attorney's materials and all of the discovery. Allen confirmed that he had met with the prosecutor and was satisfied that he had received all of the discovery. In addition, defendant confirmed that he had reviewed all of the materials along with Allen.

The court asked defendant if it was still his desire to enter a guilty plea to Count 1, the murder of Elias Silva, and to

admit all of the special allegations. Defendant stated that was still his desire. The court asked Allen if he was prepared to consent to the guilty plea and the admissions to the special allegations, and he responded, "Yes." Allen also confirmed that he was doing so unequivocally, and that he had explained to defendant the consequences of pleading guilty and admitting the special allegations. The court asked defendant if he was proceeding without any equivocation, without any question in his mind that he wanted to enter a guilty plea to the capital charge, and he responded, "Yes." Defendant also confirmed that he had thoroughly discussed this course with Allen. The court then stated that it was "going to accept the consent to the guilty pleas as is required by Penal Code section 1018."

As the prosecutor was about to review the felony plea form and waiver of rights form with defendant, the court stated, for the benefit of "anyone who is reading this transcript," that at least part of Allen's justification for consenting to the plea was articulated at the earlier in camera hearing. After the prosecutor asked Allen to indicate on the waiver form that defendant was proceeding in propria persona and was represented by advisory counsel, the court interjected that "anyone reviewing last week's transcript and proceeding would certainly understand that your role as advisory counsel at least through this proceeding today is really the role of counsel. We're not relieving or withdrawing Mr. Miracle's pro per status. He's entitled to that and he retains it both now and in future proceedings. [¶] But your role as advisory counsel has been greatly expanded. In effect, you're proceeding as counsel to Mr. Miracle. You've represented on the record . . . in the last couple proceedings and today that you've been treating your role as advisory counsel as if you were appointed

counsel; is that correct?" Allen responded, "And by the same standards of behavior, exactly. That's correct, your Honor." The prosecutor then confirmed with defendant that "you're represented by your advisory counsel Joe Allen."

In the course of reviewing his plea and waiver of rights, defendant confirmed that he was pleading guilty to the murder charge, and admitting two special circumstance allegations, murder committed by means of lying in wait and murder by an active participant in a criminal street gang to further the activities of a criminal street gang. (§ 190.2, subd. (a)(15), (22).) He also admitted enhancements for use of a deadly weapon (§ 12022, subd. (b)(1)) and commission of the murder while he was an active participant in a criminal street gang to further activities of the criminal street gang (§ 186.22, subd. (b)(1)). The court found that "the plea and admissions are knowing, intelligent, and made understandably and that they are free and voluntary." At the late July hearing, defendant pleaded not guilty to count two, the attempted murder charge. On September 8, 2005, the court granted the prosecutor's motion to amend the second count to allege assault with a deadly weapon (§ 245, subd. (a)(1)), a knife, rather than attempted murder. Defendant then changed his plea on the second count to guilty, and admitted the allegations that he personally used a knife and personally inflicted great bodily injury.

## B. Validity of Defendant's Guilty Plea

Defendant contends through counsel on appeal that his plea of guilty to the capital charge was precluded by section 1018, which provides in pertinent part: "No plea of guilty of a felony for which the maximum punishment is death, or life

imprisonment without the possibility of parole, shall be received from a defendant who does not appear with counsel, nor shall that plea be received without the consent of the defendant's counsel. . . . This section shall be liberally construed to effect these objects and to promote justice."

We have previously upheld section 1018's prohibition on the entry of a guilty plea to a capital offense without the consent of counsel. (*People v. Chadd* (1981) 28 Cal.3d 739 (*Chadd*).) In *Chadd*, the defendant wished to plead guilty, but his counsel would not consent, observing that defendant desired to commit suicide. The trial court ruled that if it found the defendant competent to act as his own attorney under *Faretta*, *supra*, 422 U.S. 806, it would accept his guilty plea without the consent of the defendant's counsel of record. It thereafter found him competent, and allowed him to plead guilty to the charges and to admit the special circumstance allegations.

On appeal, the Attorney General urged the court to construe section 1018 to allow a capital defendant to choose to represent himself and enter a guilty plea. We noted that this scenario was "entirely hypothetical: although he well knew of his right to do so, defendant never made an unequivocal request to discharge [his counsel] Mr. Pitkin and represent himself, and hence was never granted that status; on the contrary, with defendant's agreement Mr. Pitkin continued to act as his counsel throughout the proceedings. [Citation.] We will not, of course, adjudicate hypothetical claims or render purely advisory opinions." (*Chadd*, *supra*, 28 Cal.3d at p. 746.) Despite our observation, we articulated two additional reasons for rejecting the contention. First, section 1018 plainly stated "that no guilty plea to a capital offense shall be received

27

'without the consent of the defendant's counsel.' " (*Ibid*.) Second, the proposed interpretation would render the statute's third sentence, which allows noncapital defendants to waive counsel and plead guilty, redundant. (*Id*. at p. 747; see also § 1018 ["No plea of guilty of a felony for which the maximum punishment is not death or life imprisonment without the possibility of parole shall be accepted from any defendant who does not appear with counsel *unless*" specified conditions are met], italics added.)

In the alternative, the Attorney General contended the statute was unconstitutional. He appeared to concede that the state could entirely bar guilty pleas in capital cases, but argued that the state could not impose the lesser restriction of requiring consent of counsel. More particularly, he asserted that a requirement of consent "disturbs the 'uniquely personal' nature of the defendant's decision to plead guilty, denies him his 'fundamental right' to control the ultimate course of the prosecution, and destroys the constitutionally established relationship of counsel as the defendant's 'assistant' rather than his master." (*Chadd, supra*, 28 Cal.3d at p. 747.) We responded that this contention "fails to recognize the larger public interest at stake in pleas of guilty to capital offenses." (*Ibid*.; see *id*. at pp. 747-754 [analyzing issue].)

We considered section 1018 again in *People v. Alfaro* (2007) 41 Cal.4th 1277, in which counsel for the defendant declined to consent to her desire to enter an unconditional guilty plea. Like the defendant in *Chadd*, Alfaro did not invoke her right to self-representation. (*Id*. at p. 1298.) On appeal, she asserted that she sought to plead guilty to support her strategy at the penalty phase of demonstrating remorse, in contrast to the defendant in *Chadd, supra*, 28 Cal.3d 747, who

28

sought to commit suicide. We did not decide whether our reasoning in *Chadd* would apply to the asserted facts, because the record did not substantiate her claim. The record reflected that she sought to plead guilty because she feared for the safety of her family and herself if, through her defense, she implicated a particular person in the crime. Her counsel believed that the evidence she sought to avoid presenting "would mitigate her culpability for the murder." (*Id.* at p. 1301.) Therefore, "defendant's plea would have cast doubt on potentially critical mitigating evidence. A guilty plea entered under such circumstances might very well lead to the erroneous imposition of the death penalty — precisely the outcome section 1018 is intended to prevent." (*Ibid.*)

The facts in the present case are distinguishable from those in *Chadd* and *Alfaro*. Here, when defendant's counsel would not consent to a guilty plea and defendant pursued self-representation, his counsel proposed that the trial court appoint advisory counsel, authorize such counsel to participate in evaluating the appropriate plea, and require such counsel's consent to a guilty plea. Following his appointment, defendant's advisory counsel reviewed all of the discovery with defendant and concluded that pleading guilty was defendant's best strategy for avoiding the death penalty. Thereafter, the court clarified that advisory counsel's duties and responsibilities encompassed the duties of counsel under section 1018. Advisory counsel confirmed that he had accepted and discharged those duties and responsibilities, repeated that he thought a guilty plea was an intelligent strategy, and further stated that he had performed in the same manner as if he had been appointed counsel. The trial court characterized the role advisory counsel had assumed as "the functional

equivalent" of counsel. Finally, in accepting defendant's guilty plea, the court reiterated and advisory counsel confirmed that he had been acting as he would if he had been appointed counsel.

Defendant contends that his advisory counsel's consent could not satisfy the requirements of section 1018 because there is a clear line between representation by counsel and self-representation. He is correct that a defendant may not both represent himself and be represented by counsel. (*People v. Bloom* (1989) 48 Cal.3d 1194, 1218-1219 [rejecting claim that a motion to proceed in propria persona sought only cocounsel status].) However, "trial courts retain the discretion to permit the sharing of responsibilities between a defendant and a defense attorney when the interests of justice support such an arrangement." (*People v. Moore* (2011) 51 Cal.4th 1104, 1120.) Although a self-represented defendant is responsible for his defense, "the court is not foreclosed from permitting a greater role for counsel assisting a *Faretta* defendant, so long as defendant's right to present his case in his own way is not compromised." (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1164, fn. 14.)

We have recognized several forms of hybrid representation, including "advisory counsel, in which the attorney actively assists the defendant in preparing the defense case by performing tasks and providing advice pursuant to the defendant's requests, but does not participate on behalf of the defense in court proceedings." (*People v. Moore, supra,* 51 Cal.4th. at p. 1119, fn. 7.) When a trial court assigns responsibilities to advisory counsel, "the defendant is entitled to expect professionally competent assistance within the narrow scope of advisory counsel's proper role." (*People v.*

*Lawley* (2002) 27 Cal.4th 102, 145; see *People v. Hamilton*, *supra*, 48 Cal.3d at pp. 1164-1165, fn. 14 [a self-represented defendant may raise ineffective assistance claims that "arise directly from *assisting counsel's* breach of the *limited* authority and responsibilities counsel has assumed"]; see also *McKaskle v. Wiggins* (1984) 465 U.S. 168, 182 ["Even when he insists that he is not waiving his *Faretta* rights, a *pro se* defendant's solicitation of or acquiescence in certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably"].) These principles reflect that when an attorney is assigned responsibilities as advisory counsel, he or she performs as the defendant's counsel for those purposes.

Defendant contends that the language of section 1018 is clear, unambiguous, and not reasonably susceptible to a construction that allows advisory counsel to satisfy the statutory requirements imposed on counsel. We disagree. The operative portion of section 1018 provides that a capital defendant who seeks to plead guilty must "appear with counsel" and have "the consent of the defendant's counsel." As discussed above, advisory "counsel" may be appointed to handle responsibilities associated with the defense of a case and is expected to perform the assigned responsibilities in a professionally competent manner. On its face, the operative portion of section 1018 does not foreclose an interpretation of "counsel" that encompasses advisory counsel who has been assigned to fulfill the responsibilities of counsel under section 1018.

The dissent observes that the phrase " 'right to counsel' " as used elsewhere in section 1018 must "mean[] the right 'to be represented by counsel' " because the constitutional " 'right to

counsel' " sweeps only that far. (Dis. opn. of Liu, J., *post*, at p. 2, quoting § 1018; *id.* at p. 3). True enough. But it does not follow that the meaning of the *word* "counsel" is equally circumscribed. The constitutional "right to counsel" may contemplate only a particular kind of counsel, but as a linguistic matter, the word "counsel" (standing alone or in other contexts) may carry a more expansive meaning. (See, e.g., *McKaskle v. Wiggins* (1984) 465 U.S. 168, 181-183 [using "counsel" as a shorthand for "standby counsel"].) So the phrase "appear with counsel," as used throughout section 1018, is susceptible to a broader interpretation than the dissent suggests — even if the phrase "right to counsel" does not encompass advisory counsel.

Moreover, "a statute must be construed, if reasonably possible, in a manner that avoids a serious constitutional question." (*People v. Engram* (2010) 50 Cal.4th 1131, 1161.) We are presented in this case with a defendant who invoked his right to represent himself and whose best strategy to avoid the death penalty was arguably a guilty plea. As we discussed in *Chadd, supra*, 28 Cal.3d 739, 751, the high court in *Faretta, supra*, 422 U.S. 806, recognized the right of a pro se defendant to make a defense. Interpreting the operative portion of section 1018 to bar defendant from pleading guilty would raise a serious question about whether section 1018 is compatible with defendant's constitutional rights under *Faretta*. By contrast, if "counsel" is construed to include advisory counsel, then section 1018 did not forbid defendant's plea, and we need not resolve whether it could have done so constitutionally.

Assigning the responsibilities of counsel under section 1018 to advisory counsel in the case of a defendant who has exercised the right to self-representation is not inconsistent

with the purposes of section 1018. " '[S]ection 1018 is obviously designed to protect defendants by assuring that such a serious step is a fully informed and competent one, taken only after consideration with and advice by counsel.' " (*Chadd, supra,* 28 Cal.3d at p. 749.) In addition, the amendment that added the requirement that counsel consent did so to provide "a further independent safeguard against erroneous imposition of a death sentence." (*Id.* at p. 750.) By evaluating a case and advising the defendant with respect to his or her desire to plead guilty, advisory counsel safeguards against an ill-considered entry of a guilty plea. Therefore, we conclude that the term "counsel" in the operative portion of section 1018 is susceptible of a construction that includes advisory counsel — and adopt that construction.[2]

---

[2]    As noted, the word "counsel" appears in portions of section 1018 not applicable here. Although we ordinarily construe terms to have the same meaning throughout a statute, there is no categorical requirement that " 'identical words used in different parts of the same act' " must have the same meaning. (*General Dynamics Land Systems, Inc. v. Cline* (2004) 540 U.S. 581, 595; see also *People v. Hernandez* (1981) 30 Cal.3d 462, 468.) Accordingly, we express no opinion concerning whether other portions of section 1018 can or should be construed similarly — let alone how the term "counsel" should be construed in other contexts. (Cf. *People v. Lightsey* (2012) 54 Cal.4th 668, 692-699 [holding that statute requiring representation by counsel during competency proceedings did not violate defendant's right to self-representation and concluding, without identifying any serious constitutional question to be avoided, that the statutory requirement was not satisfied by appointment of advisory counsel].)

This case well-illustrates that accepting the consent of advisory counsel is compatible with the interests served by section 1018. The court appointed Allen to be defendant's advisory counsel and assigned him the responsibility to evaluate whether defendant should be allowed to plead guilty to the murder charge and to admit the special circumstance allegations. Allen, whom the court described as "a very experienced criminal defense lawyer" and "[m]aybe the most experienced that we have in Santa Barbara County," advocated on behalf of defendant with respect to his access to discovery materials and the assistance of an investigator. He reviewed all of the discovery with defendant and evaluated the strength of the evidence. He presented his views and defendant's views to the court, and the court explored those reasons with advisory counsel and defendant. After months of discussions, when the trial court finally allowed defendant to plead guilty and admit the special circumstance allegations, it confirmed with advisory counsel that he had performed as he would if he had been appointed as counsel. This process assured that defendant's plea was fully informed by advisory counsel's evaluation of the case, and the process served as a safeguard against an erroneous judgment. That defendant conducted the penalty phase differently than counsel may have (see dis. opn. of Liu, J., *post*, at pp. 5, 13) casts no doubt on the reliability of defendant's conviction nor on the truth of the special circumstance allegations that made him eligible for the death penalty. And section 1018 does not require that the attorney who consents to a plea may do so only if he or she retains control over the balance of the proceedings; nothing in section 1018 prohibits a capital defendant who has pleaded guilty from

substituting counsel or electing self-representation at the penalty phase.[3]

## III. PENALTY TRIAL

Defendant contends that the restraints placed on him during the penalty trial and the denial of any writing instrument violated his right to participate in his own defense, and his rights to due process, a fair trial, and a reliable sentencing determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments and the correlative state constitutional provisions.

### A. Proceedings Concerning Defendant's Restraints

Prior to jury selection, county counsel filed on behalf of the Santa Barbara County Sheriff's Department a motion for an order that defendant be physically restrained during the trial "by having both of his hands handcuffed within a lockbox, and to a waist chain, and having both of his legs attached to leg shackles." The sheriff's department also planned to have additional officers in the courtroom.

---

[3]    Our conclusion also resolves defendant's contention that the failure to prohibit him from entering a guilty plea deprived him of his right under the Eighth Amendment to a reliable, nonarbitrary sentencing determination, and his due process liberty interest under the Fourteenth Amendment to the enforcement of state statutory rights. As explained above, the process followed by the trial court afforded defendant the assistance and advice of counsel contemplated by section 1018 in connection with his desire to plead guilty, fulfilling the Legislature's purpose of ensuring adequate assistance and avoiding arbitrary results.

The motion was supported by declarations of three corrections officers of the Santa Barbara County Sheriff's Department, and copies of inmate discipline reports. Wendy Shannon's declaration stated that in mid-October 2004, after defendant was searched and handcuffed in preparation for transport to court, he slipped one of his hands out of the handcuffs, held down another inmate, and repeatedly punched him. Douglas Todaro's declaration stated that in late April 2005, defendant had to be extracted from his cell.[4] "In order to subdue Inmate Miracle, the extraction team had to use chemical spray, a pepperball gun, and two shots from a 50,000-volt TASER. Later that day, . . . [defendant] told [the declarant], 'I will keep fighting you, until I kill you or until you kill me.' [¶] Because of Inmate Miracle's history of being aggressive with Corrections Officers, he is housed in a single person cell and is required to be moved by two Corrections Officers, *and a Corrections Sergeant armed with a TASER*, any time he is removed from his cell." (Emphasis in original.) Trevor Carpenter's declaration stated that in mid-May 2005, after defendant had refused to comply with Carpenter's orders, defendant stated, " 'I'm glad that it's you that fucked with me, cause I always wanted to slice you up.' " The next day,

---

[4] A recording of the April extraction was played at the hearing on the motion. Sergeant Tim Morgan, the supervisor of the special operations team that extracted defendant from his cell, testified that once the team moved defendant to another cell, defendant "repetitively asked who we were, that he was going to get us back, that he was going to, I want to say use a knife to get us, and I don't remember the exact wording of slashing, or something of that nature."

Carpenter moved defendant from his cell to a shower. As Carpenter removed defendant's handcuffs, defendant pulled a razor blade from the waistband of his pants, "then turned on us and slashed out with the razor blade." With the assistance of other corrections officers, Carpenter pushed defendant into the shower room. A team was assembled to extract defendant from the shower room, but defendant "complied with their instructions, and turned over a razor and two razor blades that had been broken out of razor handles and wrapped in tape."

At the hearing on the motion, Allen stated that county counsel had indicated that defendant could have his writing hand free, but Allen was concerned that defendant could not hold paper steady while writing unless his other hand was free, and that having a hand shackled to his stomach for long hearings would be very uncomfortable. Allen also stated that defendant had been polite and well behaved in the courtroom. The court directed defendant to raise his arms, and observed that defendant would not be able to write with the lockbox on him. It then asked county counsel whether he was concerned about defendant having a sharp object for writing, and county counsel indicated that the risk could be mitigated with a short pencil. Before taking a break to allow defendant to read the motion, the court commented that based on what it had read, it was not inclined to allow defendant to have either hand free. Instead, short breaks could be taken when defendant wanted to communicate with Allen. Thereafter, county counsel stated that if the court concluded that defendant needed to have a hand free for writing, the sheriff's department believed defendant could be adequately restrained with his nonwriting hand handcuffed to a waist belt and his legs shackled, with the presence of additional deputies near him.

Following these discussions and after a video recording of the April cell extraction was played for the trial court, county counsel urged that there was a manifest need for defendant to be shackled and for one hand to be cuffed and attached to a waist belt. He added that the sheriff's department did not think these restraints could be concealed from the jury, given the position of the jury box in relation to defendant's chair, and the fact that defendant intended to wear his jail uniform. Allen noted that although the recorded cell extraction was "fairly violent," the court should keep in mind that the incident had occurred in April, defendant had behaved like a "gentleman" in court, and it had been the officers, not defendant, who used force in the recorded incident.

The court observed that there must be a manifest need for shackling, and noted the concern about the visibility of shackles during the penalty phase. It stated that "by his own choice and decision, he's going to be wearing jail clothing. So the jury is obviously going to know that he's in shackles." It explained to defendant, "You've attacked fellow inmates, you've attacked corrections officers, you've threatened to kill correction officers, you've actually either created, manufactured or found a razor blade and attempted to slash officers with a razor blade. So there is just no question whatsoever in my mind that there is an exceedingly compelling manifest need and special need for shackling in this case. There's just absolutely no question about it." It added that it was "quite concerned about putting any sort of an instrument in your hand that can be used in any form or fashion as a weapon, and at this point in the proceedings I'm not going to permit it." It further noted that the courtroom was small; it estimated that defendant was about eight feet from the court

reporter and about ten feet from the clerk. It ordered that defendant be shackled as proposed in county counsel's motion, and stated that perhaps the issue could be revisited during the trial. With respect to defendant's need to communicate with his advisory counsel, the court stated that he could whisper to him or more frequent breaks could be taken.

Allen informed the court that the lockbox was "particularly uncomfortable for long periods of time," and asked that defendant instead be placed in handcuffs "threaded through the waist chain." County counsel responded that the lockbox would prevent defendant from escaping from his handcuffs. The court concluded that in light of the incident in which defendant escaped from his handcuffs and battered a fellow inmate, he should be in a lockbox while in the courtroom, and that if it was uncomfortable, breaks could be taken.

Allen then informed the court that defendant suggested the alternative of an electric belt. County counsel observed that the use of such belts was criticized in *People v. Mar* (2002) 28 Cal.4th 1201, and the sheriff's department had chosen not to obtain such belts. Allen responded that he thought a belt could be borrowed from Los Angeles County, and that this case differed from *People v. Mar* because defendant was requesting a belt as a preferred alternative. In response to an inquiry from the court, Allen confirmed that he thought the court should allow defendant's hands to be free if he wore an electric belt. The court responded that it was concerned for Allen's safety because he was in close proximity to defendant, so it would not permit defendant to have his hands free to write. Allen then asked the court to consider the approach taken in a prior case in which the defendant's hands were free, but the leg

chain was fastened to the underpinnings of the table so that the defendant could not get up without taking the table with him. The court stated that if defendant wanted to make a written motion to change the restraints, the motion should focus on why oral communication between Allen and defendant was not effective. The discussion concluded with Allen stating for the record that he trusted defendant "absolutely not to hurt me. He knows I'm on his side, he knows I'm not going to betray him or do something evil to him. And I feel likewise about him."

At a subsequent pretrial hearing, Allen voiced his concern that defendant would be unable to take notes, and suggested adjustments in the shackles that might allow him to write. Following discussions, the court suggested that the defense investigator sit by defendant and write down whatever comments he made to her. Allen stated that the investigator would be happy to do that. The court stated that it would not allow defendant to have a pen or pencil, but it would take steps to insure defendant could have notes taken, including taking more frequent breaks. Allen then expressed concern that the shackling configuration caused defendant muscle cramps, and defendant added that "[t]his is a very stiff position for me to be in for any length of time." County counsel suggested that the lockbox could be removed during breaks, and the court suggested that the way the lockbox was affixed could be varied over the course of a day. Defendant suggested fastening an eye bolt to the table and running his chain through it, which would allow him a greater range of motion. He stated that the lockbox forced him to lean forward, and that his body, especially his neck, was stiff after one or two hours. Defendant confirmed that it helped to stand, and the court once again

proposed that they take more frequent breaks. The court added that based on its observations of defendant over a number of days, it did not appear to the court that his discomfort rose to the level of a violation of his legal rights.

With respect to defendant's proposal to be bolted to the table, county counsel opined that the one-inch piece of wood would not hold defendant. The court added that it was concerned about what the jury would see if defendant were chained to the table. "You've chosen here to be in jail clothing, so they're going to know you're in custody, and they're going to know that you've been convicted of first degree murder with special circumstances. To have handcuffs on your hands, and that's really all that appears to look like to me, to have handcuffs on your hands and a chain around your legs I don't think causes the sort of prejudice in the eyes of the jury that chaining you to a table might do." In the court's view, chaining him to the table would be like chaining a rabid dog to a fence. The court also observed that defendant could raise both hands together, move his feet back together, and separate his knees.

A week later, Allen asked to have the lockbox removed when defendant was in his cell during court breaks, because the box caused muscle cramps. The court stated that removal of the box was not necessary "in terms of the representation of himself," and left it to the sheriff's department to decide if the box could be moved without security concerns. The bailiff stated that they did not always have a key available, and a deputy stated that three bailiffs were required to unlock him and lock him again, which would hold up the proceedings. The court then stated, "I think that's your answer."

Two days later, defendant threatened corrections officers and acted violently when he was being moved from the holding cell to the courtroom, and he was returned to jail rather than brought to court. Voir dire was cancelled for the day. The next day, the court warned defendant that it was considering revoking his in propria persona status. Allen stated that defendant wanted to know if he could choose not to be present at some points in order to avoid being in restraints. The court expressed concern with his desire to avoid court, given that he was representing himself. The defense investigator stated that she had bought thermal shirts with thick wristbands to alleviate the pain, but defendant was not allowed to wear them. She had also obtained thicker socks and shoes that would be more comfortable. The court directed that defendant wear the shirt and wristbands to the next court session, unless county counsel wanted to explain to the court how these articles would impact security, and stated that it would address the issue of shoes later.

The following week, a deputy described to the court defendant's earlier misconduct in the courthouse holding cell, and stated that defendant's grievance that day had been related to discomfort from the shackles, which he claimed were too tight. County counsel informed the court that the proposed padding on defendant's wrists, with long sleeves or wristbands, would substantially increase the risk of escape from the lockbox. He further reported that defendant was restrained with a new system that day, employing hand restraints at each side of the waist chain and another set of handcuffs attached at the front of the waist chain. He also had ankle cuffs attached by chain. If this setup was to be used rather than the more secure lockbox, counsel explained, an additional deputy would

be present.  At the court's request, defendant demonstrated his range of motion, and the court expressed concern "about any system of restraints that allows any possibility of violence occurring in this courtroom."  County counsel responded that the new configuration "would provide adequate, although less security than the lockbox," and suggested that the court accept the new configuration, but further provide that "if there's any further nonconforming behavior" by defendant, the lockbox would be used.  The court agreed with this proposal, and also allowed defendant to wear thicker socks.

In sum, defendant was shackled with a lockbox through all but one day of jury selection, and was shackled with triple handcuffs, a waist chain, and leg chains for the rest of the proceedings.  The shackles were visible to the jury.  The court instructed the jury that "[t]he fact that physical restraints have been placed on defendant . . . must not be considered by you for any purpose.  You must not speculate as to why restraints have been used in determining the issues in this case.  Disregard this matter entirely."

## B. Analysis of the Propriety of Defendant's Restraints

"In general, the 'court has broad power to maintain courtroom security and orderly proceedings' [citation], and its decisions on these matters are reviewed for abuse of discretion. [Citation.]  However, the court's discretion to impose physical restraints is constrained by constitutional principles." (*People v. Lomax* (2010) 49 Cal.4th 530, 558-559.)  The federal "Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is 'justified by an essential state interest' — such as the interest in courtroom security — specific to the

defendant on trial." (*Deck v. Missouri* (2005) 544 U.S. 622, 624.) Similarly, "[u]nder California law, 'a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.'" (*People v. Lomax*, *supra*, 49 Cal.4th at p. 559.)

" '[W]e will not overturn a trial court's decision to restrain a defendant absent "a showing of a manifest abuse of discretion." ' [Citation.] To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.' [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

Defendant does not establish that the trial court abused its discretion in finding a manifest need for the physical restraints based on security concerns particular to defendant. When the trial court made its initial ruling, it had before it evidence of four violent incidents while defendant was in custody. In October 2004, defendant had slipped out of one handcuff and attacked another prisoner. In April 2005, in separate incidents, he had to be extracted from his cell, and he attempted to attack another inmate. In May 2005, defendant stated that he wanted to slice a corrections officer, and the next day, he slashed at officers with a razor blade. Because of his aggressive behavior in jail, he was accompanied by two corrections officers and a sergeant with a Taser whenever he

was moved. The fact that these incidents occurred outside of the courtroom does not diminish their relevance or their support for the trial court's order. (*People v. Hawkins* (1995) 10 Cal.4th 920, 944 [evidence need not show disruption in courtroom proceedings or attempt to escape; when there were "multiple instances of violent and nonconforming behavior while in jail, as well as an extensive background of criminal and violent activity, we will generally not second-guess the trial court's decision"].) Finally, the trial court was aware that the shackles would be visible, and acknowledged this fact when it made its ruling.[5] (See *Deck v. Missouri*, *supra*, 544 U.S. 622, 629 [use of physical restraints "visible to the jury" must be justified].)

Defendant contends the restraints were excessive. He cites county counsel's statement that "we believe that with the combination of legs shackled together and Mr. Miracle's non-writing hand restraining to a waist belt, his writing hand could be free so long as there were additional deputies nearby." The court inquired whether county counsel had any concern with respect to the fact that defendant would have a sharp object. Counsel responded, "We do have that concern, . . . and believe that we can mitigate that by providing him with, essentially, a golf pencil, a short object that wouldn't be as effective as a stabbing weapon." The trial court responded that it was "not

---

[5] The trial court observed when it made its ruling that defendant's choice to wear prison clothes made it impossible to hide the shackles. With respect to his choice of clothing, defendant asserts only that the fact he "chose to appear in his prison clothes did not diminish the prejudicial effect of his shackles."

inclined to allow Mr. Miracle to have any hand free based on what I've read." When the possibility of giving defendant a golf pencil was raised again a few weeks later, the court stated that golf pencils "may be short, but I think they can be gripped enough to cause fairly significant damage or injury."

The trial court has broad discretion to evaluate the evidence and determine the appropriate security measures in the courtroom. (*People v. Stevens* (2009) 47 Cal.4th 625, 642.) The fact that the sheriff or county counsel believed that the risk of freeing one hand and giving defendant a writing instrument could be adequately mitigated by providing additional deputies and giving defendant a short pencil does not establish that the trial court abused its discretion in deciding that defendant's hands should be restrained and he should not have any sharp object in his hand.

Defendant also contends that restraining his hands and wrists interfered with his ability to participate in his defense. First, he cites a statement by Allen that it was very difficult for defendant to handle and read papers in his holding cell with the lockbox on. The discussion that followed, however, focused solely on whether defendant could write. The trial court examined the restraint, and noted that defendant's hands and fingers were free, but agreed that he could not write with the lockbox on. Thereafter, the court suggested that the defense investigator could sit by defendant and transcribe his comments, and Allen stated that the investigator would be happy to do so. The record does not establish that defendant could not review documents or dictate notes while the lockbox was on his wrists. In addition, at the hearing when the court decided to allow the use of three handcuffs instead of the lockbox, the trial court asked defendant to take his hands

apart and move them up and down to demonstrate the additional range of motion. Following this demonstration, county counsel observed that defendant could raise the waist chain "some inches" and had "some arc with each hand."

Second, defendant asserts that he "had reason to believe his privileged, oral communications with Mr. Allen or [the defense investigator] would be overheard." In support, he cites the trial court's description of the courtroom as being small, with defendant seated "in very close proximity" to court personnel. The court's comments, which noted that the bailiffs were "close by," the court reporter was "probably eight feet away from you," and the clerk was "probably ten feet away from you," were made in the course of explaining why it would be dangerous to give defendant a pencil. There is no evidence that others would overhear if defendant whispered to the defense investigator or spoke to Allen and the investigator during breaks.

Third, defendant focuses on the physical discomfort he experienced as a result of the shackles. The discomfort was apparently due in part to the fact that the sheriff's department did not remove the lockbox while defendant was in a holding cell. In general, security arrangements in the custodial setting are determined by the officials who run the institution, not the court. (See *People v. Roberts* (1992) 2 Cal.4th 271, 307.) Here, however, the use of the lockbox in the holding cell arguably may be attributed to the trial court's order, because the sheriff's department apparently would not have used a lockbox absent the trial court's order; the lockbox remained on due to the procedures required to remove it, not necessarily due to security concerns in the jail.

Given the evidence presented to the trial court concerning defendant's violent behavior, the trial court's decision to continue the use of the lockbox, despite the fact it would remain on defendant while he was in the holding cell, was not an abuse of discretion. The trial court articulated its concrete concerns regarding the risk of allowing defendant to have a free hand. In addition, it noted that "just based on my observations in court and having watched you over a number of days it doesn't appear to be that it's the type of discomfort or pain that rises to the level of a violation of due process or a violation of your legal rights." Finally, use of the lockbox was discontinued as of the last day of jury selection, and defendant did not thereafter complain of pain. He asserts it would have been futile to complain about the new configuration of shackles, but the record reflects that the court was open to considering adjustments to the security measures.

Even if any aspect of the security arrangements had been excessive, defendant fails to establish prejudice under any standard.[6] Prejudice may be shown if shackles impaired or

---

[6] "[W]here a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.' *Chapman v. California*, 386 U.S. 18." (*Deck v. Missouri, supra,* 544 U.S. at p. 635.) The Attorney General observes that we have never held that *excessive* shackling alone establishes prejudice, and he contends that where there is adequate justification for restraints, and the claim is that the restraints are excessive, the *Chapman* standard does not apply. Instead, the Attorney General urges us to apply the *Watson* standard — whether "it

prejudiced a defendant's right to participate in the trial. (*People v. Anderson* (2001) 25 Cal.4th 543, 596 (*Anderson*).) As we have noted, defendant wore the lockbox only until the last day of jury selection. Five days before jury selection began, he informed the court that "I still have no intention of taking an active role in the selection of the jury." The court observed that there might be times when Allen offered his opinion to defendant that some question should be asked of a prospective juror, and stated that "anytime you want a moment so that the two of you can talk I'll give you that moment," but in response to a question from the prosecutor, the court confirmed that it was not likely that the court would allow both Allen and defendant to engage in voir dire. As noted above, once use of the lockbox was discontinued, the shackles did not appear to cause pain or interfere with defendant's participation.

With respect to the fact the shackles suggested to the jury that defendant was a dangerous person, we note that the jury was presented with extensive and dramatic evidence of defendant's violent conduct while incarcerated. Testimony was presented concerning three violent incidents that occurred in the seven months before jury selection was completed. In addition, the parties stipulated to a summary description of 27 other incidents of violence or threats. This evidence of his violent tendencies, which is summarized below, was far

---

is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Here, it is clear beyond a reasonable doubt that no aspect of the shackling affected the judgment. Therefore, we need not resolve this contention.

stronger than any inference the jury might have drawn from the shackles regarding his dangerous character.

The most recent episode occurred in late November 2005, in the holding facility at the courthouse during the jury selection phase. Jesse Ybarra, a senior deputy with the Santa Barbara County Sheriff's Department, testified that defendant was in an individual holding cell for his safety and the safety of others. When the officers were ready to transport him, they put shackles on him. When defendant complained that the shackles were too tight, Ybarra had an officer re-check them. That officer thought the shackles were on properly, and that "Mr. Miracle was just playing a game to get the shackles real loose." As the officers completed putting the shackles on defendant, defendant began swearing and threatening to hurt the officers. The officers then escorted him down the hallway to be taken to court. Ybarra testified that "we had a minimum of three people moving Mr. Miracle at one time, if not four, just due to safety and precautions . . . ." Defendant continued to yell loudly, use profanity, and make threats, and he was returned to his cell rather than taken to court.[7]

Four days earlier, defendant's misconduct led to a violent cell extraction. Defendant had put up a sheet that prevented

---

[7] On cross-examination, Ybarra confirmed that on the day of the incident defendant was complaining that he was in pain from the shackles. Ybarra further confirmed that adjustments had subsequently been made to address the issue, with the result that "everybody [was] getting along a little better . . . ." The problem on that particular day apparently had been that the waist chain was too tight, rather than that the lockbox was placed on defendant incorrectly.

officers from seeing him. Jeffrey Bradshaw, a corrections officer, testified that when he opened the outer door, he "felt a gush of liquid all over my body and Mr. Miracle said, 'Get the fuck out of my cell.'" David Panel, a senior corrections officer at the jail, testified that defendant refused to come out of his cell peacefully, and "had actually prepared himself for battle. He had put a sheet around his property box lid . . . to block anything that may be coming his way. He used plastic . . . that he got from a sandwich bag or something, [to make] goggles . . . ." In addition, he tied the door shut with blankets and sheets. Defendant told staff that they were not allowed to go into his "private" cell. When defendant refused to lie down, Officer Panel fired numerous pepper balls at defendant's legs, and then at defendant's shoulders when defendant pulled up a mattress to protect his body. Panel continued to fire pepper balls as four officers entered the cell to try to restrain defendant. Defendant continued to fight, and Officer Panel entered the cell with a Taser. Using the drive stun, he stunned defendant for five seconds, and was able to get defendant's right arm behind his back. He stunned defendant for two more seconds and got his other hand behind his back and cuffed him.

The most dramatic evidence of defendant's violent conduct was related to the cell extraction that occurred in April 2005.[8] The jury was shown the recording of the incident,

---

[8] At one point in the proceedings, the prosecutor referred to the cell extraction video as being of an event in May, and the briefing refers to a video of an extraction in May, but the recorded extraction took place in April 2005.

which had earlier been shown to the trial court in support of the motion for restraints. The recording reflected a very violent confrontation with six officers. As the recording was played, Officer Panel explained that defendant had put items on the window to his cell, obscuring the officers' view. Approximately eight hours after negotiations were initiated with defendant, Panel administered a chemical agent through the slot in the cell. The chemical agent makes skin feel hot and attacks the mucous membranes of the mouth and nose. Defendant used a box lid to keep Panel from putting more of the chemical through the slot. In response, an officer used a baton to keep the slot from being blocked. The officers waited to allow the chemical to have some effect, and then opened the cell door. Defendant rushed out and attempted to strike officers, one of whom used a Taser against him. Handcuffs were placed on his wrists, and a hobble was placed on his legs so he could not kick or pull his feet apart.

Finally, an investigator with the district attorney's office read a stipulated list of 27 incidents in which defendant acted in a violent or threatening manner,[9] and then read more

---

[9] The list identified the following incidents. (1) January 1993, defendant fought with another inmate in a juvenile placement. (2) July 1993, defendant and other inmates attacked a rival gang member in a juvenile placement. (3) January 1994, defendant was involved in a gang fight in custody. (4) February 1994, defendant challenged another inmate to a fight. (5) August 1994, defendant threatened an inmate with violence. (6) August 1994, defendant threatened a rival gang member with violence. (7) August 1994, defendant fought with another inmate, and struggled and physically resisted when staff took him to his room.

(8) August 1994, defendant assaulted another inmate. (9) October 1994, defendant assaulted a corrections officer, and was convicted of felony battery on a peace officer with injury. (10) and (11) April 1995 and May 1995, defendant fought with another inmate at the California Youth Authority (CYA). (12) December 1995, defendant stated that he enjoys physical violence and physical altercations. (13) December 1995, defendant committed battery on emergency personnel, and was convicted of felony assault causing great bodily injury on a youth counselor/peace officer at CYA. (14) August 1999, defendant attacked another inmate. (15) October 2000, defendant threatened a member of the staff of the Department of Corrections and Rehabilitation with bodily injury. (16) October 2000, defendant slipped handcuffs, attacked an inmate, and caused injury to the corrections officer who subdued him. (17) September 2001, defendant and two others attacked a fourth inmate. (18) November 2003, defendant committed spousal battery on his girlfriend, and pleaded guilty to willful infliction of corporal injury (§ 273.5). (19) May 2004, defendant was convicted of threatening a witness to an Eastside Gang crime. (20) October 2004, defendant slipped a handcuff while in line for the bus to court, and assaulted and injured another inmate in line, who was handcuffed. (21) October 2004, defendant stated to correctional officers in county jail, "if I'm going to do what I need to do, I don't care what you fuckers do, this is my fucking house, you motherfuckers just work here." (22) April 2005, defendant tried to attack another inmate in the county jail. (23) April 2005, defendant barricaded himself in his cell, was extracted by pepper spray and force, and tried to assault correctional officers during extraction. (24) April 2005, defendant told corrections staff that he would keep fighting them until he killed all of them or they killed him. (25) May 2005, in the county jail, defendant threatened to "slice up" corrections staff. (26) May 2005, while being escorted to the shower, defendant tried to assault county jail corrections staff with razor blades he hid in his underwear. (27) August 2005, defendant stated

detailed descriptions of some of the incidents. The 27 incidents, spanning from 1993 to August 2005, included the incident in May 2005 involving razor blades. The evidence also reflected statements defendant made regarding his intention to kill all of the corrections staff, to "go off on random corrections officers," and to build a reputation for when he was sent to prison.

In advancing his argument that he was prejudiced by the shackling, defendant focuses on the evidence of the circumstances of the crime, particularly Ibarra's role in the murder, and the fact that the jury sent the court a note with nine questions regarding the crimes and defendant's background.[10] He contends that these factors demonstrate

---

that he was willing to "go off on random corrections officers," and was building his reputation to go with him to state prison.

[10] The questions from the jury were received by the court on December 19, 2005, and were not answered before the jury returned its verdict the same day. The jury's questions were:

"1. Is there a document signed by Mr. Miracle that says he was the one who used the knife to kill Mr. Silva?

"2. What day was Mr. Miracle apprehended and where (city)?

"3. Can you give us Mr. Miracle's age and the year he first started disobeying the laws? What was the offense?

"4. Can you give us some personal background on Mr. Miracle? (family life, schooling, his children [and] wife, if any, family support system)?

"5. Where does Mr. Gilrada [sic] (witness that Mr. Miracle had at knifepoint to his throat) work? What type of work does he do? Was he employed at the time of the murder?

that the jury might have returned a sentence of life without the possibility of parole absent the shackling. Certainly, the death verdict was not a foregone conclusion, but in light of the extensive and graphic evidence of defendant's violence while incarcerated, the inference to be drawn from the shackling regarding defendant's violent tendencies could not have made any difference in the jury's evaluation of the evidence. Defendant also cites the prosecutor's argument to the jury that defendant was dangerous, but as noted above, the evidence presented at the penalty trial that defendant was dangerous provided compelling support for the argument, regardless of whether defendant was in visible restraints.

In sum, the trial court did not abuse its discretion in ordering the shackling used in this case, and defendant does not establish that the shackles impaired his ability to participate in the proceedings or prejudiced him in the eyes of the jury. (*Anderson, supra*, 25 Cal.4th at p. 596 [because the

---

"6. What happens when you use crystal meth? How long does it impact a person? Does it agitate someone? Would a person know what they're doing while under its influence?

"7. Will the testimony of this trial be used in the trial of Mr. Ybarra [sic]?

"8. You showed a video of Mr. Ybarra [sic] in a grocery store picking up various items. Were the items important to this case? Other than Gil stating it was Mr. Ybarra [sic] was there any other importance to this video?

"9. What holds more weight — what a witness states under oath or what a witness signs as to what happened to be the truth?"

physical restraints did not impair the fairness of the trial, they caused no prejudice].)

## IV. CHALLENGES TO CALIFORNIA'S JURY INSTRUCTIONS AND DEATH PENALTY STATUTE

Defendant raises a number of challenges to California's death penalty scheme and standard jury instructions that, he acknowledges, we have previously considered and rejected. Because he identifies no reason to reconsider our prior holdings, we will briefly reiterate our relevant holdings below.

"The death penalty is not unconstitutional for failing to meaningfully narrow the class of murderers eligible for the death penalty." (*People v. Henriquez* (2017) 4 Cal.5th 1, 45 (*Henriquez*).)

"Section 190.3, factor (a), which permits the jury to consider the circumstances of a defendant's crime in determining whether to impose the death penalty, does not license the jury to impose death in an arbitrary and capricious manner in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." (*People v. Simon* (2016) 1 Cal.5th 98, 149 (*Simon*).)

The death penalty is not unconstitutional on the ground that it does not require "findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or factor (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235.) "This conclusion is not altered by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 . . . and *Ring v. Arizona* (2002) 536 U.S. 584 . . . ." (*Simon, supra*, 1 Cal.5th at p. 149.)

"The federal Constitution does not require that a burden of proof be placed on the prosecution at the penalty phase. [Citation.] Nor did the trial court err by failing to tell the jury that there was no burden of proof. [Citation.] 'Unlike the guilt determination, "the sentencing function is inherently moral and normative, not factual" [citation] and, hence, not susceptible to a burden-of-proof quantification." (*Henriquez*, *supra*, 4 Cal.5th at p. 45.)

"The federal Constitution does not require that the jury agree unanimously on which aggravating factors apply. [Citation.] This does not violate a capital defendant's right to equal protection of the laws. '[C]apital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law.' " (*Henriquez*, *supra*, 4 Cal.4th at p. 45.)

" 'CALJIC No. 8.88 properly instructs the jury on its sentencing discretion and the nature of its deliberative process.' [Citation.] Its instruction that 'jurors may impose a death sentence only if the aggravating factors are " 'so substantial' " is not impermissibly vague or ambiguous.' [Citation.] 'CALJIC No. 8.88 is not constitutionally flawed because it "uses the term 'warrants' instead of 'appropriate.' " ' [Citation.] Nor is it 'unconstitutional for failing to inform the jury that if the mitigating circumstances outweigh those in aggravation, it is required to return a sentence of life without the possibility of parole.' " (*People v. Jones* (2017) 3 Cal.5th 583, 619-620 (*Jones*).)

" 'CALJIC No. 8.85 is both correct and adequate.' [Citation.] Its inclusion of such adjectives as 'extreme' and

'substantial' in the list of potential mitigating factors did not prevent the jury from considering mitigating evidence. [Citation.] The trial court properly instructed 'the jury in the language of CALJIC No. 8.85 without deleting certain factors that were inapplicable to defendant's case.' [Citation.] The trial court had no obligation to advise the jury which sentencing factors were aggravating, which were mitigating, or which could be either aggravating or mitigating depending on the jury's appraisal of the evidence." (*Jones, supra*, 3 Cal.5th 583, 620.) "The phrase 'whether or not' in section 190.3, factors (d)–(h) and (j) does not unconstitutionally suggest that the absence of a mitigating factor is to be considered as an aggravating circumstance." (*People v. Wall* (2017) 3 Cal.5th 1048, 1073; see *People v. Cook* (2006) 39 Cal.4th 566, 618.)

"We have repeatedly held that ' "[t]he trial court's failure to [instruct] the jury that there is a presumption of life does not violate a defendant's constitutional rights to due process, to be free from cruel and unusual punishment, to a reliable determination of his sentence, and to equal protection of the law under the Fifth, Eighth and Fourteenth Amendments to the federal Constitution." ' " (*People v. Cage* (2015) 62 Cal.4th 256, 293-294.)

"The penalty phase jury is not required by the federal Constitution to make written findings. [Citation.] This conclusion is not altered by the high court's decision in *Hurst v. Florida* (2016) 577 U.S. ___ [136 S.Ct. 616]." (*Henriquez, supra*, 4 Cal.5th 1, 45-47.)

"The federal Constitution does not require intercase proportionality review." (*Henriquez, supra*, 4 Cal.5th at p. 46.)

" 'California does not deny capital defendants equal protection of the law by providing certain procedural protections to noncapital defendants that are not afforded to capital defendants.' " (*Henriquez, supra*, 4 Cal.5th at p. 46.)

" 'International norms and treaties do not render the death penalty unconstitutional as applied in this state.' " (*Henriquez, supra*, 4 Cal.5th at p. 47.)

## V.  CUMULATIVE ERROR

Defendant contends the cumulative effect of errors requires reversal.  We have found no errors.  In addition, the only prejudice we have analyzed is the prejudice defendant claims exists with respect to his shackling, and we have concluded that he suffered no prejudice.

## VI.  RESTITUTION FINE

The trial court ordered defendant to pay an aggregate amount of $3,401.12 to four victim restitution funds.  It also ordered two restitution fines of $10,000 each, pursuant to sections 1202.4 and 1202.45.  The fine imposed under section 1202.4, which relates to postrelease supervision, was stayed.  In a separate case arising from defendant's conduct while in jail, the court ordered him to pay restitution fines of $2,400 each pursuant to sections 1202.4 and 1202.45, with the fine under section 1202.45 stayed.  The total amount of fines that are not stayed is $15,801.12.  Defendant did not object to these orders.

Defendant contends the restitution fines under section 1202.4 should be reduced to the statutory minimum of $200 because the trial court did not consider whether defendant was able to pay the sums imposed, and he is unable to pay a fine of

more than $200. At the time the fines were imposed, section 1202.4 provided that "[t]he restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000), if the person is convicted of a felony." (Former § 1202.4, subd. (b)(1), Stats. 2005, ch. 240, § 10.5, p. 2516.) It further provided that "[t]he court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record. A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the two-hundred dollar ($200) . . . minimum." (Former § 1202.4, subd. (c).)

Because defendant did not object to the fine at his sentencing hearing, he has forfeited his challenge. (*People v. Gamache* (2010) 48 Cal.4th 347, 409.) Furthermore, as in *Gamache*, we find that the claim fails on the merits because defendant does not establish an inability to pay. He contends his indigence is established by the fact that he was appointed counsel and provided funds for expert witnesses and investigators, and because he assertedly has no earning potential. However, the fact that he could not afford the cost of the defense in a capital case does not establish that he cannot pay these fines. As in *Gamache*, defendant does not "identify anything in the record indicating the trial court breached its duty to consider his ability to pay" (*ibid*.), and because "the trial court was not obligated to make express findings concerning his ability to pay, the absence of any findings does not demonstrate it failed to consider this factor. Thus, we

cannot say on this record that the trial court abused its discretion" (*ibid.*).

## VII. CONCLUSION

The judgment is affirmed.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**IKOLA, J.**[*]

---

[*]    Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. MIRACLE

S140894


Dissenting Opinion by Justice Liu


Penal Code section 1018 says no guilty plea to an offense punishable by death or life imprisonment without the possibility of parole "shall be received from a defendant who does not appear with counsel, nor shall that plea be received without the consent of the defendant's counsel."  Today's opinion concludes that the word "counsel" in this sentence encompasses advisory counsel, such as the attorney appointed to advise the capital defendant in this case.  (Maj. opn., *ante*, at pp. 26–35.)  But it is evident from a careful reading of the entire statute that the word "counsel" has its natural meaning. It means an attorney who *represents* the defendant; it does not encompass advisory counsel.  Because the court's contrary construction erodes the important safeguard against erroneous imposition of the death penalty that section 1018 provides, I respectfully dissent.

## I.

Penal Code section 1018 provides in full:  "Unless otherwise provided by law, every plea shall be entered or withdrawn by the defendant himself or herself in open court. No plea of guilty of a felony for which the maximum punishment is death, or life imprisonment without the possibility of parole, shall be received from a defendant who does not appear with counsel, nor shall that plea be received without the consent of the defendant's counsel.  No plea of

guilty of a felony for which the maximum punishment is not death or life imprisonment without the possibility of parole shall be accepted from any defendant who does not appear with counsel unless the court shall first fully inform him or her of the right to counsel and unless the court shall find that the defendant understands the right to counsel and freely waives it, and then only if the defendant has expressly stated in open court, to the court, that he or she does not wish to be represented by counsel. On application of the defendant at any time before judgment or within six months after an order granting probation is made if entry of judgment is suspended, the court may, and in case of a defendant who appeared without counsel at the time of the plea the court shall, for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted. Upon indictment or information against a corporation a plea of guilty may be put in by counsel. This section shall be liberally construed to effect these objects and to promote justice." (All undesignated statutory references are to the Penal Code.)

Let us focus on the second and third sentences of the statute. These sentences have parallel structure. The second sentence applies to defendants facing the death penalty or life imprisonment without parole, whereas the third sentence applies to defendants facing lesser sentences. The third sentence speaks of "the right to counsel" and waiver of that right by a defendant's informed, voluntary, and express statement in open court that "he or she does not wish to be represented by counsel." In other words, "the right to counsel" means the right "to be represented by counsel." Further, a defendant seeking to plead guilty must "appear with counsel unless" the defendant validly waives "the right to counsel."

The text of the statute leaves no doubt that "counsel," in all of its usages in the third sentence, means an attorney who represents the defendant. "Attorneys serving in an advisory or standby capacity do not 'represent' the defendant . . . ." (*People v. Lightsey* (2012) 54 Cal.4th 668, 692; see *ibid.* [interpreting the phrase "represented by counsel" in section 1368 to exclude advisory counsel].) And there is no such thing as a right to advisory counsel. (See *People v. Moore* (2011) 51 Cal.4th 1104, 1119–1120 ["[A] defendant has no right, under either the federal or state Constitution, to 'hybrid representation.' Criminal defendants have the constitutional right to have an attorney represent them, and the right under the federal Constitution to represent themselves, but these rights are mutually exclusive." (fn. omitted)].)

In light of the unambiguous meaning of "counsel" in section 1018's third sentence, the term "counsel" in the second sentence is most naturally read to have the same meaning. (See *People v. Ruiz* (2018) 4 Cal.5th 1100, 1113 [" 'It is an established rule of judicial construction that when a term appears in different parts of the same act . . . , the term should be construed as having the same meaning in each instance.' "].) This reading is further bolstered by the fact that we are construing the same term in neighboring sentences that address " 'the same or an analogous subject' matter." (*Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 201; see *People v. Tran* (2015) 61 Cal.4th 1160, 1168 [" 'when statutes are *in pari materia* similar phrases appearing in each should be given like meanings' "]; *id.* at p. 1167.) Moreover, the neighboring sentences have parallel structure, and they share an identical usage ("appear with counsel") that was originally enacted as parts of a single sentence.

(Stats. 1949, ch. 1310, § 1, p. 2298 ["No plea of guilty of a felony for which the maximum punishment is death, or life imprisonment without the possibility of parole, shall be received from a defendant who does not *appear with counsel,* nor shall any plea of guilty of any other felony be accepted from any defendant who does not *appear with counsel* unless the court shall first fully inform him of his right to counsel and unless the court shall find that the defendant understands his right to counsel and freely waives it." (italics added)].)

Today's opinion acknowledges that the phrase "right to counsel" in the third sentence of section 1018 must mean the right "to be represented by counsel," as the statute plainly says. (Maj. opn., *ante,* at pp. 31–32.) From there, the court says "the word 'counsel' (standing alone or in other contexts) may carry a more expansive meaning." (*Id.* at p. 32; see *id.* at p. 33, fn. 1.) But the court makes no effort to examine the context in which the word "counsel" appears in section 1018. How could the word "counsel," as used in the third sentence, mean something different in the phrase "appear with counsel" than in the phrase "right to counsel" or "represented by counsel"? After all, the third sentence says that a defendant seeking to plead guilty must "appear with counsel *unless* the court shall first fully inform him or her of the right to counsel and *unless* the court shall find that the defendant understands the right to counsel and freely waives it, and then *only if* the defendant has expressly stated in open court, to the court, that he or she does not wish to be represented by counsel." (Italics added.) In addition, how could the phrase "appear with counsel" mean something different in the second sentence than in the third sentence, in light of the fact that both usages were

4

originally enacted as part of a single sentence? The court simply ignores these obvious linguistic clues.

In addition to defying ordinary rules of construction, the court's interpretation of section 1018 is problematic for reasons that are apparent in this case. Defendant Joshua Miracle was initially represented by Michael Carty. When Miracle decided he wanted to plead guilty to special-circumstance murder, Carty refused to consent. Miracle then sought to represent himself in order to plead guilty. The trial court granted Miracle's request and appointed Joe Allen as advisory counsel. Allen consented to Miracle's guilty plea because he believed Miracle's acceptance of responsibility would serve as important mitigating evidence in an "intelligent penalty phase strategy." Allen told the trial court that the fact that Miracle's plea would be used at the penalty phase "is a very important factor for me in agreeing to go along with this proposal." But Miracle told the trial court that he "just want[ed] to make clear that . . . using that as mitigating evidence at the penalty trial is not my motive for pleading guilty." And in fact, Miracle "did not present any evidence at the penalty phase and declined to make a closing argument." (Maj. opn., *ante*, at p. 8.)

From this sequence of events, it is clear that Allen's consent to Miracle's guilty plea did not serve as the "independent safeguard" that section 1018 requires (*People v. Chadd* (1981) 28 Cal.3d 739, 750 (*Chadd*)) because Allen, as advisory counsel, did not and could not exercise control over trial strategy. That control belonged exclusively to Miracle after the trial court allowed him to represent himself. The clear disconnect between the rationale for Allen's consent and Allen's inability to direct a defense in accordance with that

rationale illuminates why the term "counsel" in the second sentence of section 1018 does not encompass advisory counsel.

In response to this disconnect, today's opinion says "nothing in section 1018 prohibits a capital defendant who has pleaded guilty [with counsel's consent] from substituting counsel or electing self-representation at the penalty phase." (Maj. opn., *ante*, at p. 34–35, fn. omitted.) But, as the trial court in this case recognized, self-representation after the guilt phase of a capital proceeding is a matter within the trial court's discretion (*People v. Bloom* (1989) 48 Cal.3d 1194, 1220), as is substitution of appointed counsel at any point (*People v. Walker* (1976) 18 Cal.3d 232, 238). In discussing with Miracle his desire to plead guilty, the trial court considered the option of appointing Allen as counsel but made clear that if it did so, it "would not then allow defendant to represent himself again if he did not like how Allen was representing him at either stage." (Maj. opn., *ante*, at p. 21.) Section 1018 is properly construed against the backdrop of trial courts' authority to prevent capricious or manipulative behavior by defendants.

Today's holding is in significant tension with *Chadd*, where we held that "the trial court had no authority to accept [the defendant's] guilty plea to a capital offense in the face of his counsel's express refusal to consent to the entry of such a plea." (*Chadd*, *supra*, 28 Cal.3d at p. 746.) There, the Attorney General had argued that "section 1018 can be 'construed' to permit a capital defendant to discharge his attorney, represent himself, and enter a guilty plea." (*Ibid.*) "But," we said, "that is precisely what the third sentence of section 1018 expressly authorizes *noncapital* defendants to do. The proposal would thus obliterate the Legislature's careful

distinction between capital and noncapital cases, and render largely superfluous its special provision for the former.  Such a construction would be manifestly improper."  (*Id.* at p. 747, fn. omitted.)

The scenario we disapproved in *Chadd* is essentially the scenario the court approves today in light of the appointment of advisory counsel who, although well-meaning, had no authority to direct Miracle's defense and whose advice on penalty-phase strategy ultimately went unheeded.  This is an end run around section 1018's clear prohibition on accepting a guilty plea to a capital offense unless the defendant "appear[s] with counsel" and has "the consent of [his] counsel."  As we said in *Chadd* and reaffirmed in *People v. Alfaro* (2007) 41 Cal.4th 1277 (*Alfaro*), " 'it is difficult to conceive of a plainer statement of law than the rule of section 1018 that no guilty plea to a capital offense shall be received "without the consent of the defendant's counsel." ' "  (*Id.* at p. 1298, quoting *Chadd*, *supra*, 28 Cal.3d at p. 746.)  The Legislature need not abide the erosion of this important safeguard in capital cases; it can correct today's decision by expressly stating that the word "counsel" in section 1018 means an attorney who represents the defendant and does not include advisory or standby counsel.

## II.

The Attorney General, taking a view contrary to his position in another pending case (Respondent's Answering Br. at p. 34, *People v. Frederickson* (S067392)), argues that reading section 1018 to mean what it plainly means would run afoul of a capital defendant's constitutional right to refuse counsel and represent himself.  (*Faretta v. California* (1975) 422 U.S. 806

(*Faretta*).)  Today's opinion says its construction of section 1018 has the virtue of avoiding this constitutional issue.  (Maj. opn., *ante*, at p. 32.)  But we construe statutes to avoid serious constitutional questions only when doing so is "reasonably possible."  (*People v. Engram* (2010) 50 Cal.4th 1131, 1161; see *Warger v. Shauers* (2014) 574 U.S. __, __ [135 S.Ct. 521, 529] [the avoidance canon " 'has no application in the absence of . . . ambiguity' "].)  Like this court in *Chadd* and *Alfaro*, I see no ambiguity here, especially when the second sentence of section 1018 is read together with the third sentence.  And in any event, like this court in *Chadd* and *Alfaro*, I see no constitutional infirmity in section 1018, at least as applied to the facts here.

In *Chadd*, the Attorney General argued that if section 1018 cannot be construed to permit a capital defendant to discharge counsel, represent himself, and enter a guilty plea, then "it is unconstitutional because it allows counsel to 'veto' a capital defendant's decision to plead guilty."  (*Chadd*, *supra*, 28 Cal.3d at p. 747.)  We rejected the argument, explaining that it "fails to recognize the larger public interest at stake in pleas of guilty to capital offenses.  It is true that in our system of justice the decision as to how to plead to a criminal charge is personal to the defendant:  because the life, liberty or property at stake is his, so also is the choice of plea. [Citation.]  But it is no less true that the Legislature has the power to regulate, in the public interest, the manner in which that choice is exercised.  Thus it is the legislative prerogative to specify which pleas the defendant may elect to enter (Pen. Code, § 1016), when he may do so (*id.*, § 1003), where and how he must plead (*id.*, § 1017), and what the effects are of making or not making certain pleas.

8

"A plea of guilty, of course, is the most serious step a defendant can take in a criminal prosecution. It operates first as a waiver of formal defects in the accusatory pleading that could be reached by demurrer. [Citations.] Next, because there will be no trial the plea strips the defendant of such fundamental protections as the privilege against self-incrimination, the right to a jury, and the right of confrontation. [Citations.] As to the merits, the plea is deemed to constitute a judicial admission of every element of the offense charged. [Citation.] Indeed, it serves as a stipulation that the People need introduce no proof whatever to support the accusation: the plea ipso facto supplies both evidence and verdict. [Citation.] 'A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment.' [Citation.] Finally, it severely restricts the defendant's right to appeal from the ensuing judgment. [Citation.]" (*Chadd, supra,* 28 Cal.3d at pp. 747–748.)

Section 1018's prohibition on pleading guilty to capital charges without the consent of counsel, *Chadd* explained, "was an integral part of the Legislature's extensive revision of the death penalty laws in response to the decision of the United States Supreme Court in *Furman v. Georgia* (1972) 408 U.S. 238. (Stats. 1973, ch. 719, §§ 2–6, pp. 1297–1300.) That revision, of course, was an effort to eliminate the arbitrariness that *Furman* found inherent in the operation of prior death penalty legislation. [Citation.] The fact that the requirement of counsel's consent to guilty pleas in capital cases was enacted as part of that statutory scheme demonstrates that the

Legislature intended it to serve as a further independent safeguard against erroneous imposition of a death sentence.

"Two years later the United States Supreme Court decided *Faretta*, holding that defendants in state criminal trials have a federal constitutional right of self-representation. But that decision did not strip our Legislature of the authority to condition guilty pleas in capital cases on the consent of defense counsel. . . . [¶] . . . The opinion first categorizes the several pretrial and trial rights guaranteed by that amendment as 'necessary to a full defense' ([*Faretta, supra,* 422 U.S.] at p. 818), and observes that the amendment 'constitutionalizes the right in an *adversary criminal trial* to *make a defense* as we know it.' (*Ibid.*; italics added.) The opinion then reiterates (at p. 819) that the amendment grants to the accused personally 'the right to make his defense,' and concludes: 'Although not stated in the Amendment in so many words, the right to self-representation — *to make one's own defense personally* — is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences *if the defense fails.*' (Italics added; fn. omitted.) (*Id.* at pp. 819–820.)

"The Attorney General in effect stands *Faretta* on its head: from the defendant's conceded right to 'make a defense' in 'an adversary criminal trial,' the Attorney General attempts to infer a defendant's right to make *no* such defense and to have *no* such trial, even when his life is at stake. But in capital cases, as noted above, the state has a strong interest in reducing the risk of mistaken judgments. Nothing in *Faretta*, either expressly or impliedly, deprives the state of the right to conclude that the danger of erroneously imposing a death

sentence outweighs the minor infringement of the right of self-representation resulting when defendant's right to plead guilty in capital cases is subjected to the requirement of his counsel's consent." (*Chadd, supra,* 28 Cal.3d at pp. 750–751.)

Just as a state may prohibit all guilty pleas to murder charges or may prohibit capital defendants from waiving an automatic appeal without running afoul of *Faretta* (see *Chadd, supra,* 28 Cal.3d at pp. 751–752), the requirement of counsel's consent to a guilty plea to a capital offense is a " 'reasonable' " means of protecting the state's interest in the accuracy and fairness of its proceedings (*id.* at p. 753). It serves "as a filter to separate capital cases in which the defendant might reasonably gain some benefit by a guilty plea from capital cases in which the defendant, as here, simply wants the state to help him commit suicide." (*Ibid.,* fn. omitted.)

In 2007, we reaffirmed this understanding of section 1018 in *Alfaro.* There, a capital defendant sought to enter a guilty plea not with the goal of committing suicide but "to avoid testifying against 'Beto,' whom her counsel sought to implicate as an accomplice in the murder." (*Alfaro, supra,* 41 Cal.4th at p. 1300.) Defense counsel refused to consent to the plea, and the trial court determined that under section 1018 it lacked authority to accept the plea absent counsel's consent. We held that counsel's refusal to consent was reasonable (*Alfaro,* at pp. 1300–1301), and we rejected the defendant's argument that her desire to plead guilty "concerned a fundamental aspect of her defense that . . . must remain within defendant's control" (*id.* at p. 1302). Relying extensively on *Chadd,* we concluded that "nothing in the record supports defendant's contention that her desire to plead guilty was motivated by a desire to establish a defense of remorse or to

demonstrate her acceptance of responsibility for the murder so that a lesser punishment might be imposed at the penalty phase. Accordingly, the trial court reasonably concluded that the dispute between defendant and her counsel did not implicate a constitutionally protected fundamental interest that might override the plain terms of section 1018." (*Alfaro*, at p. 1302, fn. omitted; see *id.* at pp. 1298–1301.)

Our unanimous opinion in *Alfaro* reaffirmed that "[t]he consent requirement of section 1018 has its roots in the state's strong interest in reducing the risk of mistaken judgments in capital cases and thereby maintaining the accuracy and fairness of its criminal proceedings." (*Alfaro, supra*, 41 Cal.4th at p. 1300, citing *Chadd, supra*, 28 Cal.3d at pp. 750, 753.) We explained that "[t]he statute constitutes legislative recognition of the severe consequences of a guilty plea in a capital case, and provides protection against an ill-advised guilty plea and the erroneous imposition of a death sentence." (*Alfaro*, at p. 1300; cf. *Beck v. Alabama* (1980) 447 U.S. 625, 638 (*Beck*) [Eighth Amendment's prohibition on cruel and unusual punishment requires a heightened degree of reliability in capital cases not only in sentencing but also in "the guilt determination"].) And recently, we again recognized that "[a] societal interest in the integrity of the capital process may at times outweigh a defendant's stated preferences in controlling his or her own case. For example, . . . state law prevents any defendant from pleading guilty to capital charges without consent of counsel, in light of 'the state's strong interest in reducing the risk of mistaken judgments in capital cases and thereby maintaining the accuracy and fairness of its criminal proceedings.' (*Alfaro, supra*, 41 Cal.4th at p. 1300.)" (*People v. Daniels* (2017) 3 Cal.5th 961, 1005 (*Daniels*); see also *People v.*

*Mai* (2013) 57 Cal.4th 986, 1055 [citing section 1018 as an example of the "limited circumstances in which, as a matter of fundamental public policy, rights and decisions that are normally personal to a criminal defendant may be limited or overruled in the service of death penalty reliability"].)

Like *Chadd* and *Alfaro*, this case presents no occasion to decide whether section 1018 unconstitutionally restricts a capital defendant's right to make fundamental decisions about his or her defense when the defendant, against the advice of counsel, wishes to plead guilty as part of a strategy to avoid the death penalty. In such a case, the disagreement between the defendant and counsel arguably goes to the right to "make one's own defense personally." (*Faretta, supra,* 422 U.S. at p. 819.) Here, by contrast, Miracle told the trial court that he "want[ed] to do the right thing and take responsibility and offer exonerating testimony on behalf of Mr. Ibarra," and that he "just want[ed] to make clear that . . . using that as mitigating evidence at the penalty trial is not my motive for pleading guilty." Although Allen said a "very important factor" for him (Allen) in agreeing with the plea was its utility as mitigating evidence in the penalty phase, Miracle consistently told the trial court that he did not wish to offer any mitigating evidence at the penalty phase (maj. opn., *ante,* at pp. 12–14, 19–20), and in fact he did not put on any mitigating evidence (*id.* at p. 8). As in *Alfaro,* the record does not show that defendant's "desire to plead guilty was motivated by a desire to establish a defense of remorse or to demonstrate [his] acceptance of responsibility for the murder *so that a lesser punishment might be imposed at the penalty phase.*" (*Alfaro, supra,* 41 Cal.4th at p. 1302, italics added.)

Miracle may have believed, according to his own ethical code, that accepting responsibility — with no further instrumental purpose — was "the right thing" to do for himself and for his codefendant Ibarra. But the state has a strong interest in the operation of its criminal justice system in accordance with applicable law, not the ethical code of a particular defendant. This interest is at its apex in capital cases due to the severity and finality of the death penalty. (See *Beck*, *supra*, 447 U.S. at p. 637.) To be sure, a self-represented defendant may decide not to mount any defense in a capital trial. (*Daniels*, *supra*, 3 Cal.5th at pp. 984–985.) "But a trial, even one where a defense is voluntarily forgone, is fundamentally different from a guilty plea. In [a trial], the state [is] put to its burden of proof as to the murder charges and related counts. A plea, on the other hand, 'serves as a stipulation that the People need introduce no proof whatever to support the accusation' and ' "is itself a conviction." ' (*Chadd*, *supra*, 28 Cal.3d at p. 748.) Moreover, a guilty plea severely limits the right to appeal. (See *ibid*.)" (*Id.* at p. 983.)

It is true that Allen believed the prosecution's evidence was very strong and advised Miracle to that effect. But Allen's support for Miracle's plea as part of "an intelligent penalty phase strategy" provided no check on whether the plea, shorn of any use at the penalty phase, would heighten the risk of a mistaken judgment in this capital case. The attorney who *had* considered that question, Carty, refused to consent to the plea. Here, as in *Chadd* and *Alfaro*, the application of section 1018 as an "independent safeguard against erroneous imposition of a death sentence" does not impermissibly compromise the constitutional right to self-representation or the right to

control a fundamental aspect of the defense.  (*Chadd*, *supra*, 28 Cal.3d at p. 750; see *Alfaro*, *supra*, 41 Cal.4th at p. 1302.)

The Attorney General cites *McCoy v. Louisiana* (2018) 584 U.S. __ [138 S.Ct. 1500]), which held that defense counsel cannot concede a capital defendant's guilt over the defendant's objection.  The high court reasoned that a defendant's decisions to "refuse to plead guilty in the face of overwhelming evidence against her" and to "maintain[] her innocence at the guilt phase of a capital trial" are "not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*."  (*Id.* at p. 1508.)  I acknowledge that aspects of *McCoy* may be read to suggest that a defendant retains the ultimate right to decide whether to plead guilty to capital charges.  (See, e.g., *ibid.* ["whether to plead guilty" is a decision "reserved for the client"].)  But *McCoy* did not weigh a defendant's autonomy interests against countervailing reliability interests; it did not address whether a capital defendant may enter a guilty plea against the advice of counsel in the face of a state statute requiring counsel's consent as a measure to lessen the risk of a mistaken judgment.  (See *People v. Ghobrial* (2018) 5 Cal.5th 250, 285 ["'a decision is not authority for propositions not considered'"].)  *McCoy*'s holding is that "it is the defendant's prerogative, not counsel's, to decide on the objective of his defense:  to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt."  (*McCoy*, at p. __ [138 S.Ct. at p. 1505].)  The case before us does not involve a defendant who sought "to admit guilt in the hope of gaining mercy at the sentencing stage."  (*Ibid.*)

In sum, the trial court should have followed its initial instinct not to accept Miracle's guilty plea without the consent of counsel. The discharge of Miracle's attorney and appointment of advisory counsel who subsequently agreed with the plea did not satisfy section 1018's plain requirement that a defendant who wishes to plead guilty to a capital offense must "appear with counsel" and have the "consent of the defendant's counsel." The constitutionality of applying section 1018 might be a more difficult question if Miracle had chosen to plead guilty in order to improve his penalty-phase defense, as Allen had advised. But the application of section 1018 to the circumstances here presents no constitutional infirmity. The trial court's error under section 1018 requires reversal of the judgment on the counts to which Miracle pleaded guilty. (See *Chadd*, *supra*, 28 Cal.3d at pp. 754–755.)

I respectfully dissent.

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Miracle
_____

___

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

___

**Opinion No.** S140894
**Date Filed:** December 3, 2018
_____

___

**Court:** Superior
**County:** Santa Barbara
**Judge:** Brian E. Hill


_____

___

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, and Andrea G. Asaro, Deputy State Public Defender, for Defendant and Appellant.

Law Offices of John T. Philipsborn, John T. Philipsborn; Sanger Swysen & Dunkle and Stephen K. Dunkle for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jaime L. Fuster, Joseph P. Lee, Peggy Z. Huang, James William Bilderback II and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Andrea G. Asaro
Deputy State Public Defender
1111 Broadway, Suite 1000
Oakland, CA  94607
(510) 267-3300

Blythe J. Leszkay
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 269-6191