Filed 3/3/25  P. v. Clark CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>AARON CLARK,<br><br>Defendant and Appellant. | B329936<br><br>(Los Angeles County<br>Super. Ct. No. PA092601) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Walgren, Judge.  Affirmed.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jason Tran and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Aaron Clark of rape, oral copulation, and kidnapping of two victims over the course of two days. On appeal, he raises several claims of error. First, he argues that the trial court violated his due process rights by requiring him to wear a stealth belt without a showing that he was dangerous. Second, he contends that the court should have excluded from evidence a text message by one of his victims referring to prior uncharged conduct of rape of a child. Finally, he argues that his trial counsel was ineffective for failing to offer expert testimony supporting his claim that he did not recall the crimes due to substance abuse. We affirm.

## PROCEDURAL HISTORY

An amended information filed in September 2022 charged appellant with two counts of forcible oral copulation committed against victims D.M. and Y.G.[1] (Pen. Code, § 287, subd. (c)(2)(A),[2] counts one and three); the forcible rape of D.M. (§ 261, subd. (a)(2), count two); and the kidnapping of Y.G. to commit oral copulation (§ 209, subd. (b)(1), count four). The amended information further alleged that appellant personally used a deadly and dangerous weapon, a knife (§§ 12022.3, subds. (a) and (b), 12022, subd. (b)(1), 667.61, subds. (a), (b), and (e)) and committed crimes against multiple victims (§ 667.61, subds. (a) and (e)). In addition, the amended information alleged that appellant suffered prior convictions of serious or violent felonies (§§ 667, subds. (a) and (d), 1170.12, subd. (b)).

---

[1] We refer to the victims by initials to protect their privacy. (See Cal. Rules of Court, rule 8.90(b)(4).)

[2] Further undesignated statutory references are to the Penal Code unless otherwise indicated.

2

Appellant's jury trial commenced on September 7, 2022.[3] On September 14, 2022, the jury found appellant guilty as charged on all counts and found the special allegations true. Following a bifurcated court trial, the court found the prior strike conviction true beyond a reasonable doubt. The court sentenced appellant to 25 years to life on count one, doubled to 50 years to life due to the prior strike conviction, plus a ten-year determinate term for the weapon enhancement. The court imposed consecutive terms of 50 years to life, plus ten-year determinate terms on each of counts two and three. On count four, the court sentenced appellant to a consecutive term of seven years to life, doubled to 14 years to life, plus a six-year determinate term for the weapon enhancement and prior strike. Appellant timely appealed.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

#### A. *Victim D.M.*

D.M. testified that she met appellant through a dating website. They texted each other for a few days and then agreed to meet at his house to "chill." Around 1:00 a.m. on April 13, 2019, D.M. drove to appellant's house on Dyer Street in Sylmar. After she pulled her car over, appellant got into the passenger seat. They talked for a few minutes, then appellant pulled out a knife, pointed it at D.M., and said "this is a rape. I'll slit your throat if you don't listen." D.M. testified that she was scared and

---

[3] The case was continued multiple times in 2021 due to prison quarantines and after appellant fired his retained counsel and then rehired him several months later. In mid-2022, defense counsel requested a section 730 competency evaluation; appellant was found competent and the case proceeded.

told appellant, "you don't have to rape me." Appellant then told her to perform oral sex on him and she complied. After three to five minutes, she asked if he had a condom so they could be safe. Appellant said they were going to have sex without a condom. He reclined the passenger seat and told D.M. to slide into the seat underneath him. She complied and appellant raped her for approximately two hours.[4] During the rape, appellant told D.M. that he was going to keep her at his house for a year. D.M. asked if she could leave and told appellant she had a young son. Appellant told her they were going to go into his house and "do it" again. After appellant ejaculated, D.M. said that she had to use the bathroom. They both got out of the car and then D.M. got back into the driver's seat, locked the doors, and drove away.

A short time later, appellant texted her that he had left his wallet in her car and asked her to throw it in front of his house. D.M. found appellant's wallet in her car, containing his driver's license. She texted back, "I'm never going back that way. You just raped me at knifepoint. You better be lucky I don't call the cops." Appellant responded, "All right." Appellant continued to try to call and text her later that morning. D.M. texted him back, asking why he was calling her. Appellant responded, "Sorry, won't call ever." D.M. replied, "You better not you effing rapist. You're going to hell. I looked your name up, and you went to jail for rape before, even rape of a kid." Appellant responded, "I'm not going to call you. I'm sorry. Block me, and I'll block you."

---

[4] During cross-examination, D.M. testified that during the rape, appellant was making "chomping" motions with his mouth and his eyes were rolling back into his head. She thought he might have been intoxicated but was not sure.

Copies of the text messages between appellant and D.M. were admitted into evidence.

D.M. called 911 later that morning to report the rape. She gave police appellant's name, address, and date of birth from his driver's license. A few days later, she identified appellant as the assailant from a photo lineup.

B.  *Victim Y.G.*

A second victim, Y.G., testified about an incident that occurred the following day, April 14, 2019. At the time, Y.G. was working as an entertainer and she was notified by her agency that a client had requested her services. She was given appellant's name and address on Dyer Street. Y.G. arrived at appellant's house around 6:00 p.m. on April 14. She parked her car in front of the house, but appellant came out and said she could not park there because his neighbors would get upset.

Y.G. got back into her car and appellant followed, attempting to get into the front passenger seat. Y.G. told appellant that she was not allowed to have clients in her car, but he "jumped" into the passenger seat anyway. Appellant then pointed a knife at her and told her to drive around the corner. Y.G. testified that she was scared and complied, stopping the car around the corner as directed by appellant. Appellant pulled down his pants, removed his penis, and told her to "suck it." Y.G. began to cry and orally copulated appellant for a minute or two. When she saw some people approaching the car, she jumped out of the car and began screaming. Appellant got out of the car, so Y.G. got back in and drove away.

5

Y.G. drove home and called 911.[5]  That same night, Y.G. identified appellant as her assailant as police detained him outside his house.

The parties stipulated to the results of the DNA evidence from the sexual assault examinations performed on D.M., Y.G., and appellant.  The results found Y.G.'s DNA on appellant's genitals and appellant's DNA on D.M.'s underwear and clothing.

C.    *Prior Crimes*

The prosecution also offered evidence of several prior convictions, including a 2003 conviction for one count of forcible rape (§ 261, subd. (a)(2)), and a 2014 conviction for one count of child molestation with a prior conviction (§ 647.6, subd. (a)(1)). The victim from the 2014 conviction, J.L., testified that on three occasions when she was 10 years old, appellant approached her and asked if she wanted to go to a hotel with him.  She was scared and said no.

## II.    Defense Evidence

Appellant testified in his defense. He stated that he did not remember any of the events involving D.M. or Y.G. because he was on methamphetamines.  He also was not taking his prescribed medication, methazolamide, which he explained "calms me down.  It stops me from shaking and hearing voices." According to appellant, he did not recall much after April 1, 2019 because he was "blacking out" from taking "too much" methamphetamine every day.  He also took "wax marijuana." Appellant did not become aware of his surroundings again until he was in jail and did not recall any part of the events on April 12 through 14.

---

[5]    The prosecution played the recordings of the 911 calls by D.M. and Y.G. for the jury.

6

The parties stipulated to the toxicology results showing only cannabinoids in appellant's system at the time of his arrest on April 14, 2019. Appellant denied that these findings showed there were no methamphetamines in his system after his arrest. He denied sending any text messages to D.M. either before or after the assault and stated he did not recall having a knife. When asked to explain the DNA results, he stated that he "didn't do this crime," and that it was a lie or a mistake because he did not rape the victims.

During cross-examination, the prosecution confronted appellant with his 2003 conviction for rape. Appellant stated that he "didn't do that crime. It was sexual [*sic*] with a foreign object. And they gave me 20 years." Asked about a 2006 felony conviction while in prison for gassing a correctional officer,[6] he testified he did not recall, but also that it "was with water." He also did not "really recall" his 2014 conviction for molesting a minor, but then stated that he "didn't talk to any minor" and "didn't do anything." He stated that he was "wrongfully convicted."

## DISCUSSION

### I.  Use of Restraints

The trial court ordered appellant to be placed in a stealth belt restraint during trial. Appellant contends this was unnecessary and therefore violated his due process rights. We disagree.

---

[6]  A violation of section 4501.1, aggravated battery by gassing, occurs when a prisoner intentionally throws onto a peace officer "any human excrement or other bodily fluids or bodily substances . . . that results in actual contact with the person's skin or membranes."

A.    *Factual Background*

Prior to the start of trial on September 7, 2022, the court considered the issue of restraints, reviewing a report from the prison that indicated "substantial incidents of lack of cooperation in the jail facility going back at least two years."  For example, the court cited two incidents in August 2020, one in which appellant refused to enter a cell and threatened to bite the other inmates, and another in which a nurse assistant alleged that appellant "attempted to touch her breast during an examination." In July 2019, appellant refused to leave his cell, and staff noted "there have been numerous times of insubordination and discipline in the past 30 days."  The court cited multiple incidents between April and June 2019 where appellant refused to leave or enter a cell and refused to follow orders.  The court also noted that appellant had previously refused to come to court, requiring an extraction order.  The court stated, "Although I do not feel the burden as to shackling is a manifest need, I do think there is a manifest need for such restraints."

The court then asked the bailiff for additional information. The bailiff responded that appellant was "classified in our jail as a K-12 which is an inmate that has to be restrained 24 hours a day in a cell. We do 25-minute checks every time to make sure for his safety as well."  The bailiff also stated that he had spoken to a "mental health clinical supervisor downtown who said that as of this year, July of 2022, [appellant] was also in a suicide gown and has had a history of that before.  Mr. Clark has had issues, at least that we know of, of mental health issues dating back [*sic*] July of 2019 and has been so since."

The court also noted that the previous day, appellant was wearing a yellow jail shirt, "which does indicate he's housed in

8

the mental ward."[7]  The court then concluded, "based on everything I just recited as well as what the deputy recited -- again, although I do not believe there's a need to show manifest need because it will be a stealth belt that will be completely concealed under his clothing, the jury will have no idea that he is restrained -- I am going to order that stealth belt be used, again not visible to the jury, and I find that there is a manifest need for that to take place."  After appellant was restrained with a stealth belt, the court added that he had been previously convicted of gassing a peace officer under section 4501.1.  Defense counsel did not object to the use of restraints; he concurred that the belt was completely hidden under appellant's clothing and not visible to the jury.

During the prosecution's case, the court admonished appellant for two "outburst[s] in front of the jury," and cautioned him that further disruption would result in his absence from the courtroom.  When he testified, appellant took the witness stand outside of the presence of the jury.

B.    *Legal Principles*

"'In general, the "court has broad power to maintain courtroom security and orderly proceedings."'" (*People v. Poore* (2022) 13 Cal.5th 266, 285 (*Poore*), quoting *People v. Hayes* (1999) 21 Cal.4th 1211, 1269.)  "However, the court's discretion to impose physical restraints is constrained by constitutional principles.  Under California law, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints."'" (*Poore, supra,* 13 Cal.5th at p. 285, quoting *People v. Duran* (1976) 16 Cal.3d 282, 290–291

---

[7]     Appellant wore civilian clothing for trial.

9

(*Duran*).)  "We have held that these principles also apply to the use of an electronic 'stun belt,' even if this device is not visible to the jury.  [Citations.]"  (*People v. Lomax* (2010) 49 Cal.4th 530, 558–559.)

"In determining whether there is a manifest need to restrain the defendant, courts consider several factors, including evidence that the defendant poses a safety or flight risk or is likely to disrupt the proceedings."  (*People v. Simon* (2016) 1 Cal.5th 98, 115.)  The trial court is not required to hold a formal hearing to determine whether restraints are necessary. (See *People v. Mar* (2002) 28 Cal.4th 1201, 1221.)  But "when the imposition of restraints is to be based upon conduct of the defendant that occurred outside the presence of the court, sufficient evidence of that conduct must be presented on the record so that the court may make its own determination of the nature and seriousness of the conduct and whether there is a manifest need for such restraints; the court may not simply rely upon the judgment of law enforcement or court security officers or the unsubstantiated comments of others.  [Citations.]"  (*Ibid.*)

"'[W]e will not overturn a trial court's decision to restrain a defendant absent 'a showing of a manifest abuse of discretion.'"  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390 (*Bryant*), quoting *People v. Wallace* (2008) 44 Cal.4th 1032, 1050.)  "To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.' A merely debatable ruling cannot be deemed an abuse of discretion.  [Citations.]  An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of

10

justice. . . .”’” (*Bryant, supra*, 60 Cal.4th at p. 390.)

C.    *Analysis*

Respondent contends that appellant forfeited his right to challenge the use of restraints because he did not object below. (See *People v. Tuilaepa* (1992) 4 Cal.4th 569, 583 [“It is settled that the use of physical restraints in the trial court cannot be challenged for the first time on appeal.  Defendant's failure to object and make a record below waives the claim here.”].) Appellant acknowledges that he did not raise the issue below, but appears to argue that an objection would have been futile because the court explained its reasoning “purporting to justify the use of restraints.”  Appellant therefore asserts there was “nothing an objection would have added.”  This claim is particularly meritless given appellant's assertion that the trial court's ruling was “confusing, to say the least.”  By failing to object to the restraints on the bases he now raises, appellant denied the prosecution the opportunity to respond to his concerns, and denied the court the ability to clarify its reasoning and/or correct any errors.  (See *People v. Saunders* (1993) 5 Cal.4th 580, 590 [“‘The purpose of the general doctrine of waiver is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had.’”].)  He therefore forfeited this claim.

Appellant argues that if the issue was forfeited, his counsel was ineffective for failing to object at trial.  But in order to establish ineffective assistance, appellant must show that he was prejudiced by his counsel's deficient performance.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).  He cannot do so here. In a case rejecting a similar ineffective assistance claim, our Supreme Court reasoned, “counsel's performance could not

possibly have affected the outcome at trial. The guidelines imposed by *People v. Duran, supra*, 16 Cal.3d 282, 290, are intended, in large part, to avoid prejudice in the minds of jurors where a defendant appears or testifies in obvious restraints, or where the restraints deter him from taking the stand in his own behalf. We have consistently found any unjustified or unadmonished shackling harmless where there was no evidence it was seen by the jury." (*People v. Tuilaepa, supra,* 4 Cal.4th at pp. 583-584; see also *Poore, supra*, 13 Cal.5th at pp. 288-289; *People v. Foster* (2010) 50 Cal.4th 1301, 1322.) Here, the stealth belt was not visible to jurors, and it did not deter appellant from testifying.

Moreover, even if we were to consider the merits of appellant's claim, we would find no abuse of discretion in the court's imposition of restraints. Appellant contends that the court's order was confusing and that the court did not make the requisite finding that there was a manifest need for restraint. The court appeared to believe there was no required showing of manifest need where the restraints would not be visible to the jury. To the extent the court made such a finding, it was in error, as *any* physical restraints imposed in the jury's presence require a finding of manifest need for such restraint. (See, e.g., *People v. Lomax, supra,* 49 Cal.4th at pp. 558–559.) However, any such error was harmless, as the court also found there was a manifest need for restraints.

We conclude that appellant has not established that the trial court abused its discretion in finding a manifest need to restrain appellant in the courtroom. The court cited evidence of multiple incidents of violent and disruptive behavior by appellant over the course of several years, including refusal to comply with

12

orders to enter and exit a cell, refusal to come to court requiring an extraction, threatening to bite other inmates, attempting to assault a nurse, and throwing bodily fluids onto a peace officer. In addition, the court relied on testimony from an officer that appellant was considered such a safety risk that he was restrained in his jail cell at all times and was checked every 25 minutes. Based on this evidence, the court was within its discretion to find a manifest need for restraint because appellant posed a safety risk and/or was likely to disrupt the proceedings.

Appellant suggests that the court erred because the evidence related only to appellant's conduct outside the courtroom. But he cites no cases supporting the contention that a court cannot consider a defendant's disruptive or violent behavior elsewhere as relevant to whether there is a risk of such violence or disruption in the courtroom. Indeed, it is well-established that the court may consider such evidence. (See, e.g., *People v. Miracle* (2018) 6 Cal.5th 318, 347 ["The fact that these incidents occurred outside of the courtroom does not diminish their relevance or their support for the trial court's order."]; *Bryant, supra,* 60 Cal.4th at p. 390 ["Given the serious potential consequences on both sides of the scale, the range of factors the court may consider in assessing and weighing the risks [of using restraints] should be broad."].) We therefore conclude that the trial court properly considered the evidence of appellant's behavior and mental state and did not abuse its discretion in ordering restraints in the courtroom.

## II. Reference to Uncharged Conduct

Appellant next contends that the trial court erred in admitting the portion of a text message from D.M. stating that appellant "went to jail for rape before, even rape of a kid." He

13

argues that this was evidence of uncharged conduct that was irrelevant and highly prejudicial. We find that appellant forfeited this claim and further, that any possible error was harmless.

A. *Factual Background*

Prior to trial, the court ruled that the prosecution could introduce evidence of appellant's prior convictions for sex offenses under Evidence Code section 1108.[8] The prosecution presented documentary evidence of appellant's 2003 conviction for forcible rape and 2014 conviction for child molestation with a prior conviction, as well as the testimony of J.L. regarding the latter conviction. Appellant does not challenge the admission of these prior convictions on appeal.

The prosecution also sought to introduce the text messages between appellant and D.M. These messages included the exchange after the rape in which D.M. told appellant not to call her again and that "I looked your name up, and you went to jail for rape before, even rape of a kid." Appellant responded, "I'm not going to call you. I'm sorry. Block me, and I'll block you." The prosecution argued that appellant's apology was relevant as an admission. The court admitted the evidence, finding that "[i]n light of the fact that the court has already ruled under Evidence Code 1108 that the prior sexual crimes can be admitted and in light of the fact that that reads as an admission of the defendant, I will allow that." Defense counsel did not object during this

---

[8]     Evidence Code section 1108 allows admission of the defendant's prior sexual offenses as evidence of propensity, subject to the usual admissibility requirements of Evidence Code section 352.

14

discussion or during D.M.'s testimony regarding the text messages.

B. *Analysis*

At the outset, respondent contends that this claim is forfeited due to appellant's failure to object at trial. We agree. A party must make a timely and specific objection to the admission of evidence to preserve a challenge on appeal (see *People v. Ramos* (1997) 15 Cal.4th 1133, 1171; *People v. Goldman* (2014) 225 Cal.App.4th 950, 960), and appellant did not do so.

Further, we would also reject appellant's claim on the merits. Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review rulings regarding relevance and admission of evidence for abuse of the trial court's broad discretion. (See *People v. Streeter* (2012) 54 Cal.4th 205, 237.)

Appellant argues that D.M.'s statement was inadmissible under section 352 because there was no evidence that appellant was ever convicted of raping a child and the suggestion that he did so was highly inflammatory. While the text message thread was otherwise admissible, and is unchallenged by appellant here, we agree with appellant that the reference to "rape of a kid" did not clearly refer to any of the prior offenses allowed into evidence by the court. Although respondent contends the jury likely "understood" the statement to refer to the prior conviction for child molestation, the message accused appellant of rape, not molestation. We therefore agree with appellant that it was error

15

for the trial court to admit the portion of D.M.'s message referring to "rape of a kid."

We disagree with appellant, however, that this error requires reversal. We assess the erroneous admission of other crimes evidence for prejudice under the standard of *People v. Watson* (1956) 46 Cal.2d 818. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 76; see also *People v. Felix* (1993) 14 Cal.App.4th 997, 1007–1008.) This standard requires reversal if it appears reasonably probable that, absent the error, a result more favorable to the defendant would have been reached. (See *People v. Watson, supra*, 46 Cal.2d at pp. 836-837.)

We find no prejudice here, as the evidence of appellant's guilt was overwhelming. Both victims repeatedly identified appellant as the perpetrator and gave consistent and detailed testimony regarding the crimes. Their testimony was corroborated by the DNA evidence found on appellant and the victims, appellant's wallet in D.M.'s car, and the text messages between appellant and D.M. in which he apologized after D.M. accused him of raping her at knifepoint. Appellant threatened both victims with a knife and told D.M. he would "keep her for a year" despite her pleas to release her because she had a young son. The jury also heard evidence that appellant had been previously convicted of rape and child molestation, including testimony from victim J.L. regarding appellant asking her to go to a hotel multiple times when she was 10 years old. Given the weight of this evidence, we find it was not reasonably probable that, absent the admission of the challenged portion of D.M.'s

16

text message, the jury would have reached a more favorable verdict to appellant.[9]

## III. Failure to Call an Expert

Appellant testified at trial that he did not recall any of his crimes due to blackouts caused by overdosing on methamphetamines. He argues that his counsel was ineffective for failing to call an expert witness to support this claim. We are not persuaded.

### A. *Legal Principles*

To prevail on a claim of ineffective assistance of counsel, a defendant must establish both that counsel's performance was deficient and that he was prejudiced by the deficient performance. (*Strickland, supra,* 466 U.S. at p. 687; *People v. Ledesma* (1987) 43 Cal.3d 171, 218.) To establish deficient performance, a defendant must show that counsel's representation was objectively unreasonable "under prevailing professional norms." (*Strickland, supra,* 466 U.S. at p. 688.) To establish he was prejudiced, a defendant must show there is "a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694; see also *People v. Goldman* (2014) 225 Cal.App.4th 950, 957.) Unless the defendant establishes otherwise, we presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

---

[9]     Appellant's failure to establish prejudice also dooms his claim that his counsel was ineffective for failing to object.

17

If the record "'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citations.]" (*People v. Ledesma, supra,* 39 Cal.4th at pp. 745-746.)

B.      *Analysis*

Appellant fails to establish either deficient performance or prejudice and thus cannot sustain a claim of ineffective assistance. First, he cannot show that his trial counsel was deficient for failing to present an expert as to his mental state. Tactical decisions, such as witness selection, "are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." (*People v. Bolin* (1998) 18 Cal.4th 297, 333 (*Bolin*), citing *Strickland, supra,* 466 U.S. at p. 690.) Appellant posits that his counsel could have offered expert testimony supporting the idea that the absence of methamphetamines from his drug test results "does not preclude a lingering effect on the defendant's mental state." But he has provided no evidence that his counsel failed to consult an expert or that such an expert would have been able to provide favorable testimony. Appellant's speculation about potentially favorable expert testimony cannot meet his burden to establish ineffective assistance. As our Supreme Court has explained, "[s]uch claims must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused. [Citations.] We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation." (*Bolin, supra,* 18 Cal.4th at p. 334; see also *People v. Datt* (2010) 185 Cal.App.4th

18

942, 952–953 [counsel not ineffective where defendant "failed to establish that his trial counsel failed to consult an expert or that such an expert would have been able to provide favorable testimony"].)

Appellant's counsel advanced the voluntary intoxication defense in his opening and closing arguments to the jury. He argued that appellant was intoxicated and "wasn't fully there." He also told jurors during closing argument that they could, "based on your own experiences" determine that appellant was under the effects of methamphetamine despite the negative lab results and therefore was not acting of his own volition. This record strongly suggests that counsel's decision not to call an expert was tactical, which we will not second-guess on appeal. (See *People v. Riel, supra*, 22 Cal.4th at p. 1185.)

Second, we find that appellant cannot establish he was prejudiced by his counsel's failure to call an expert. Appellant acknowledges that the lab results showing only cannabinoids in his system "surely undermined" his claim that he had taken large amounts of methamphetamines and did not intentionally commit the crimes. In addition, appellant's claim was undercut by the significant evidence that he was not severely impaired at the time of the crimes, including his text messages with D.M. before and after the rape and his use of a ruse to get Y.G. to a more secluded location before assaulting her.

Moreover, as the jury was instructed, voluntary intoxication is not a defense to forcible oral copulation or forcible rape, as those are general intent crimes. (See *People v. Atkins* (2001) 25 Cal.4th 76, 82 ["certain sexually based offenses require a showing of only general intent, that is, the intent to commit an act 'without reference to intent to do a further act or achieve a

19

future consequence'"]; see also *People v. Warner* (2006) 39 Cal.4th 548, 557 ["[R]ape (§ 261), . . . and oral copulation (§ 288a) are all general intent crimes and, hence, contain no 'sexual gratification' specific intent element."].)  Thus, the only charge for which appellant could have asserted this defense was count four, kidnapping to commit oral copulation.  The evidence at trial that appellant directed Y.G. to a secluded location at knifepoint, pulled down his pants, removed his penis, and ordered Y.G. to "suck it" overwhelmingly established that he possessed the requisite mental intent to commit oral copulation.  As such, appellant's claim of ineffective assistance fails.

Finally, we reject appellant's claim that the cumulative effect of the asserted errors was prejudicial.  As we have explained, any errors were harmless and the evidence of appellant's guilt was overwhelming.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, ACTING P. J.


We concur:


MORI, J.


ZUKIN, J.